IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

———————————————

No. 2014-1300, 2015-1167, -1168

———————————————

PURE FISHING, INC., AN IOWA CORPORATION,

Plaintiff-Cross-Appellant,

v.

NORMARK CORPORATION, A MINNESOTA

CORPORATION, DBA RAPALA,

Defendant-Appellant.

———————————————

On Appeal from the United States District Court
For the District of South Carolina in
District Court No. 10-CV-2140
Judge Cameron McGowan Currie

———————————————

**BRIEF OF DEFENDANT-APPELLANT NORMARK CORPORATION**

———————————————

DORSEY & WHITNEY LLP
J. Thomas Vitt, Esq.
Shannon L. Bjorklund, Esq.
Michael Weinbeck, Esq.
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402
(612) 340-2600

*Counsel for Defendant-Appellant*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4 counsel of record for Defendant-Appellant Normark Corporation certifies the following:

1.     The full name of the party represented by counsel of record is Normark Corporation.

2.     The entity identified above is the real party in interest.

3.     Parent corporations and any publicly held companies that own 10 percent or more of the stock of Normark Corporation are NC Holdings, I, Inc., which is in turn owned by Rapala VMC Corporation.

4.     The names of all firms and the partners and associates that have appeared for Normark Corporation in the proceeding before United States District Court District of South Carolina or who are expected to appear for the party in this Court are:  J. Thomas Vitt, Sri Sankaran, Mariah L. Reynolds, Shannon L. Bjorklund, Michael Weinbeck, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN  55402; and Tim F. Williams, Alan R. Marshall, Dority & Manning, P.A., 55 Beattie Place, Suite 1600, Greenville, SC  29601.

Dated:  January 21, 2015

Respectfully submitted,


By s/Michael Weinbeck
J. Thomas Vitt (0183817)
Shannon L. Bjorklund (0389932)
Michael Weinbeck (0392531)
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868
vitt.thomas@dorsey.com
bjorklund.shannon@dorsey.com
weinbeck.michael@dorsey.com

***Attorneys For Defendant-Appellant
Normark Corporation***

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF RELATED CASE ...................................................................1

JURISDICTIONAL STATEMENT ..................................................................2

STATEMENT OF THE ISSUES..........................................................................3

STATEMENT OF THE CASE...............................................................................4

    I.    PURE FISHING'S ALLEGATION OF INFRINGEMENT
        AGAINST NORMARK ...................................................................4

    II.   PURE FISHING'S COOK PATENT....................................................4

    III.  THE PRIOR ART ............................................................................6

    IV.  THE EVIDENCE ESTABLISHING THAT ROGER COOK
        DID NOT INVENT THE COOK PATENT CLAIMS.........................8

        A.    AlliedSignal and DSM Independently Recommended and
              Performed Heat Stretching Before Cook's Claimed
              Conception Date.......................................................................8

        B.    Cook Derived His Claimed Invention From DSM ...................10

    V.    PURE FISHING'S REFUSAL TO ABANDON ITS CLAIM
        OF INFRINGEMENT AFTER ROGER COOK'S
        DEPOSITION HAD MADE CLEAR THAT COOK WAS
        NOT THE INVENTOR OF THE COOK PATENT..........................15

VI.   NORMARK'S MOTION FOR SUMMARY JUDGMENT OF

INVALIDITY ...................................................................16

VII.   THE INEQUITABLE CONDUCT TRIAL .........................................19

VIII.   THE DISTRICT COURT'S ORDERS ON NORMARK'S

MOTIONS FOR ATTORNEYS' FEES ............................................20

SUMMARY OF THE ARGUMENT ....................................................24

ARGUMENT ...................................................................26

I.   STANDARD OF REVIEW ................................................26

II.   THE DISTRICT COURT ABUSED ITS DISCRETION BY

DENYING NORMARK'S EXCEPTIONAL CASE MOTION.........27

A.   THE *OCTANE FITNESS* STANDARD ...................................27

B.   THE DISTRICT COURT'S OCTOBER 28, 2014

ORDER SHOULD BE REVERSED BECAUSE IT IS

BASED ON CLEARLY ERRONEOUS FACTUAL

FINDINGS AND ERRORS OF LAW ....................................29

1.   The District Court's finding that Pure Fishing's

position on inventorship was not sufficiently weak

to warrant an exceptional case finding improperly

ignored the evidence and the law of conception ............29

2.   The District Court's finding that Pure Fishing did

not litigate the Cook Patent claim in an

unreasonable manner is also clearly erroneous ..............33

3.    The District Court's order should also be reversed

because it is based upon errors of law ...........................35

III.    THE DISTRICT COURT ERRED BY NOT USING ITS

INHERENT AUTHORITY TO AWARD NORMARK

RECOVERY OF ITS EXPERT WITNESS FEES ............................39

IV.    THE DISTRICT COURT ABUSED ITS DISCRETION BY

DENYING NORMARK'S RULE 11 MOTION ................................39

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
   421 U.S. 240 (1975)........................................................................29, 38

*Antonious v. Spalding & Evenflo Cos. Inc.*,
   275 F.3d 1066 (Fed. Cir. 2002) .................................................27, 40

*Bayer CropScience AG v. Dow AgroSciences LLC*,
   2015 WL 108415 (D. Del. Jan. 5, 2015) ........................................34

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l., Inc.*,
   393 F.3d 1378 (Fed. Cir. 2005) ......................................27, 28, 29, 37

*Brubaker v. City of Richmond*,
   943 F.2d 1363 (4th Cir. 1991) ....................................................27, 42

*Classen Immunotherapies, Inc. v. Biogen Idec*,
   2014 WL 2069653 (D. Md. May 14, 2014).......................................38

*Coleman v. Dines*,
   754 F.2d 353 (Fed. Cir. 1985) ...........................................................30

*Creative Compounds, LLC v. Starmark Labs.*,
   651 F.3d 1303 (Fed. Cir. 2011) .........................................................30

*Highmark, Inc. v. Allcare Health Mgmt. Sys.*,
   687 F.3d 1300 (Fed. Cir. 2012), *rev'd on other grounds*, 134 S.Ct.
   1744 (2014).........................................................................................24

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
   134 S.Ct. 1744 (2014).........................................................21, 22, 26

*Hunter v. Earthgrains Co. Bakery*,
   281 F.3d 144 (4th Cir. 2002) ......................................................27, 40

*iLOR, LLC v. Google, Inc.*,
   631 F.3d 1372 (Fed. Cir. 2011) .................................................27, 39

*In re Kunstler*,
  914 F.2d 505 (4th Cir. 1990) ............................................................40

*Lending Tree, LLC v. Zillow, Inc.*,
  2014 WL 5147551 (W.D.N.C. Oct. 9, 2014) ....................................38

*MarcTec, LLC v. Johnson & Johnson*,
  664 F.3d 907 (Fed. Cir. 2012) ........................................................39

*Mathis v. Spears*,
  857 F.2d 749 (Fed. Cir. 1988) ........................................................39

*Mergenthaler v. Scudder*,
  11 App. D.C. 264, 1897 WL 17698 (D.C. Cir. 1897) ............................30, 31, 33

*Morris v. Wachovia Secs., Inc.*,
  448 F.3d 268 (4th Cir. 2006) ......................................................29, 40

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S.Ct. 1749 (2014)..............................................................*passim*

*Raylon, LLC v. Complus Data Innovations, Inc.*,
  700 F.3d 1361 (Fed. Cir. 2012) (Reyna, J. concurring) ..............................24, 29

*Standard Oil Co. v. American Cyanamid Co.*,
  774 F.2d 448 (Fed. Cir. 1985) ....................................................27, 36

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
  549 F.3d 1381 (Fed. Cir. 2008) ........................................................39

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
  726 F.3d 1306 (Fed. Cir. 2013) ........................................................36

*Tegal Corp. v. Tokyo Electron Am., Inc.*,
  257 F.3d 1331 (Fed. Cir. 2001) ........................................................27

*Transonic Sys., Inc. v. Non-Invasive Med. Techs. Corp.*,
  75 F. App'x 765 (Fed. Cir. 2003) ......................................................36

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
  208 F.3d 981 (Fed. Cir. 2000) ........................................................37

*W. Elec. Co. v. Piezo Tech., Inc.*,
   860 F.2d 428 (Fed. Cir. 1988) ....................................................................26, 33

**Statutes**

35 U.S.C. § 102(f) ..........................................................................................16, 18

35 U.S.C. § 285 ...........................................................................................*passim*

**Other Authorities**

Fed R. Civ. P. 11 .........................................................................................*passim*

U.S. Patent No. 5,749,214..........................................................................*passim*

U.S. Patent No. 6,174,525.....................................................................................4

## <u>STATEMENT OF RELATED CASE</u>

This Court has addressed the following appeal arising from the same District Court action:

**Pure Fishing, Inc., Plaintiff-Appellant v. Normark Corporation (doing business as Rapala), Defendant-Appellee.**

**No. 2013-1655.**

Plaintiff-Appellant Pure Fishing, Inc. appealed the District Court's December 11, 2012 Order granting summary judgment to Defendant-Appellee Normark Corporation.  A panel comprised of Judges Newman, Lourie, and Dyk issued a per curiam order affirming the District Court's judgment on June 20, 2014.

# JURISDICTIONAL STATEMENT

Defendant-Appellant Normark Corporation appeals from the order of the District Court entered on January 21, 2014 (Dist. Ct. Dkt. No. 375), which was the final order entered by the District Court adjudicating Normark's motion for Rule 11 sanctions and for recovery of fees and expenses under Rule 11 and the District Court's inherent authority, and the District Court's October 28, 2014 Order (Dist. Ct. Dkt No. 398), which was the final order entered by the District Court on Normark's motion seeking recovery of attorneys' fees and expenses under Section 285 of the Patent Act, 35 U.S.C. § 285.  Normark timely filed its Notice of Appeal of the January 21, 2014 order on February 14, 2014.  It timely filed its Notice of Appeal of the October 28, 2014 order on November 24, 2014.

The District Court's jurisdiction had jurisdiction pursuant to 28 U.S.C. § 1338.  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## <u>STATEMENT OF THE ISSUES</u>

(1) Did the District Court abuse its discretion in its October 28, 2014 Order denying Normark's renewed motion for recovery of attorneys' fees and expenses under Section 285?

(2) Did the District Court abuse its discretion in its January 21, 2014 Order by denying Normark's motion asking the Court to use its inherent power to award Normark recovery of expert witness fees not receivable under Section 285?

(3) Did the District Court abuse its discretion in its January 21, 2014 Order denying Normark's motion for sanctions and recovery of attorney fees and expenses under Fed. R. Civ. P. 11?

## STATEMENT OF THE CASE

### I.    PURE FISHING'S ALLEGATION OF INFRINGEMENT AGAINST NORMARK

Pure Fishing, formerly known as Berkley, is an Iowa corporation.  Normark is a Minnesota corporation and a subsidiary of Rapala VMC Corporation.  In 2008, Rapala acquired the rights to Sufix fishing lines from Yao I Fabric Co. Ltd. ("Yao I"), and Normark began selling Sufix in the United States.  A2010.  Pure Fishing sued Normark in 2010, alleging that Yao I manufactured certain Sufix products using a process that infringed claims 1, 4, and 5 of Pure Fishing's U.S. Patent No. 5,749,214 ("Cook Patent").  A119-128.[1]

### II.    PURE FISHING'S COOK PATENT

Pure Fishing's Cook Patent claims a process for increasing tenacity in a braided fishing line made from gel-spun polyolefin yarns ("GSP"), by stretching the braided line under heat.  A127:15:28-35.  Pure Fishing applied for the Cook Patent on October 4, 1996, and it issued on May 12, 1998.  A119.  Roger Cook is the sole named inventor.  *Id.*

GSP is a very strong material, and fishing lines made from GSP are called "Superlines."  *See* A1640-44, A1646-54.  Superlines were introduced in 1993. A1646-54.  Pure Fishing had two early Superline products, Gorilla Braid and Ultra Max.  A1781.  The 1993 Superlines were not heat stretched after braiding. AlliedSignal Corporation, now Honeywell ("AlliedSignal"), and DSM (formerly

---

[1]    Pure Fishing also alleged infringement of U.S. Patent No. 6,174,525 ("Kelley Patent").  The District Court's October 28, 2014 award of additional attorney fees to Normark for the Kelley Patent litigation is the subject of Pure Fishing's cross-appeal.

Dutch State Mines) supply the GSP used to make Superlines. AlliedSignal's product is called Spectra, and DSM's is called Dyneema.

Pure Fishing's Cook Patent explains that GSP yarns "can be used to make braided fishing lines exhibiting low stretch as well as high toughness," but it notes that the braiding process introduces inefficiencies and that a braid's overall strength is not equal to the sum of the strength of the individual yarns. A120:1:45-51. GSP is a low-stretch material, and the most stressed filaments will generally break before sufficient elongation has occurred to allow the remaining filaments to share the load. A120:1:48-64. "The result is a reduced efficiency in the strength of the line or a weakened line (due to broken filaments) after stress." *Id*. at 1:62-64. This efficiency problem is the only problem noted by the Cook Patent. The Cook Patent teaches that heat stretching the braided line distributes "the load-bearing function more evenly among filaments and yarns in the braid," addressing the efficiency problem. A120:2:18-19.

Several terms are important to understanding the Cook Patent and the asserted claims:

- Break Load Strength: The force it takes to break a line, often expressed in grams; synonym for the line's pound test. Describing a fishing line as a "20 lb. test line" means it should not break until 20 pounds of force is applied. A1513.

- Denier: The weight in grams of 9,000 meters of material. The larger the denier, the thicker the material. A1513.

- Tenacity: Break load strength divided by denier, typically expressed as grams per denier ("gpd"). A1513; A121:3:62. Because tenacity is a ratio, stretching can increase tenacity even if break load strength decreases, as long as denier decreases faster. A1513.

- Stretching and Drawing:  The terms are synonyms.  A2987.  The Cook Patent describes setting the velocity of the output rollers at a higher rate than the input rollers, to create a positive "draw ratio" and thus stretch the line while under heat.  A121:3:53-59.

- Draw Ratio:  The patent defines as "the ratio of the output velocity to the input velocity of rollers acting on the line."  A121:3:53-56.

- Total Draw Ratio:  The product of individual draw ratios in a multistage process, calculated by multiplying the individual draw ratios.  A121:3:58-60.

- Yarn:  Defined by the patent to include "fiber, multifilament assembly, or tow."  A121:3:44-45.  Each yarn is made up of multiple filaments, which is the smallest unit.  *Id.*; *see also* A121:3:46.

Claims 1, 4, and 5 of the Cook Patent claim the use of heat stretching to increase the tenacity of a braided or twisted GSP fishing line, made from 3 to 64 yarns and with each yarn having a denier from about 20 denier to about 1000 denier.  Claim 1 reads:

> Claim 1:  A process for increasing tenacity in a twisted or braided fishing line made of gel spun polyolefin yarns, said process comprising stretching a braided or twisted line of 3-64 gel spun polyolefin yarns, wherein each yarn is within the range from about 20 denier to about 1000 denier, at a temperature within the range from about 110°C. to about 150°C. and at a total draw ratio within the range from about 1.0 to about 2.0.

A127:15:28-35.  Claims 4 and 5 depend from claim 1, with claim 4 narrowing the total draw ratio to "about 1.05 to about 1.5" and claim 5 narrowing it to "about 1.1 to about 1.4." [2] A127:15:42-49.

## III.    THE PRIOR ART

The use of heat stretching to increase tenacity has been known for decades.

---

[2]    The District Court construed "about 1.0" to require a draw ratio of at least 1.01, to meet the requirement of "stretching."  A927.

A1514.  Before Pure Fishing's Cook Patent, DSM and AlliedSignal used heat stretching to increase the tenacity of their Dyneema and Spectra yarns.  *Id.*  Heat stretching was also known to improve braided structures, including synthetic fishing lines, before the Cook Patent.  A1514-15.  The Ryan Patent describes heat stretching synthetic fishing lines to address the same efficiency problem discussed in the Cook Patent, noting that heat stretching "works well with very small diameter" synthetic fishing line.  A1565:1:57-2:5; *see also* A1699-1700, A1788-90.

DSM's Hogenboom Patent describes heat stretching a GSP rope to increase tenacity.  A321-323.  Hogenboom defines "rope" as "rope, cord, cable, string and similar structures," but the specific examples in the Hogenboom Patent are larger than typical fishing lines.  A322:1:10-12.  Hogenboom teaches the same heat stretching parameters claimed by the Cook Patent—a 140°C temperature and 5% and 23% elongation percentages.  A323:3:15-23, 30-33; A1721-22.  Hogenboom's elongation percentages are the same as draw ratios of 1.05 and 1.23.  A1721.  Cook admitted that it would be easier to heat stretch a fishing line than Hogenboom's rope, and that the Cook Patent's claimed invention is an expected result.  A1725.  Pure Fishing's expert, Egbert van Gorp, agreed with Cook, testifying that it would be an expected result, known from Hogenboom and Ryan, to use heat stretching to increase the tenacity of a braided structure.  A1836-38, A1787-90, A1784-92, A1802-03, A1804-1810.

AlliedSignal also has a heat stretching patent, the Dunbar Patent.  A1574-1612.  The Dunbar Patent's Example 7 describes heat stretching an 8 yarn GSP

braid at 140.5°C, at draw ratios of 1.16-1.33, to increase tenacity by 20-35%. A1583-84; A1592. The starting yarn denier is 1190. A1515-16; A1583-84; A1592. Example 7 matches the asserted claims of the Cook Patent, except that Example 7's yarn denier of 1190 is greater than claim 1's "about 1000" denier yarn. A1726-28; A1827-28.

## IV.  THE EVIDENCE ESTABLISHING THAT ROGER COOK DID NOT INVENT THE COOK PATENT CLAIMS

### A.  AlliedSignal and DSM Independently Recommended and Performed Heat Stretching Before Cook's Claimed Conception Date

Pure Fishing and Roger Cook identified **October 5, 1994** as Cook's conception date. A1684-85; A1693-95; A1717; A1892-1918. Before October 5, 1994, Cook worked with monofilament fishing lines and coatings for Superlines. A2990-91. Dan Foote was in charge of Superline development at that time. A2981.

Foote set up a meeting with AlliedSignal for August 18, 1994, to discuss GSP supply and get technical information from AlliedSignal about improving Pure Fishing's Superline products. A1656-58; A1759-63. Foote wanted to make Pure Fishing's Superlines stronger and thinner, and hoped that AlliedSignal could supply stronger or thinner yarns. A1760. These were obvious goals, as Foote stated: "we weren't the only ones who knew those were valuable properties. . ." A1736.

At the meeting, AlliedSignal recommended that Pure Fishing heat stretch its braided fishing lines. A1520; A3084; A3270-71. Cook attended with Foote. A3079-80; A3270-71. AlliedSignal showed Pure Fishing an example of a heat-

8

stretched braided fishing line (probably a Spiderwire, a competing product). A1743-45; A1764-67.  AlliedSignal's meeting memorandum identified heat stretching braided fishing line as a "low hanging fruit" action item (A1662), something that Foote confirmed was "obvious to do."  A1764-65.  AlliedSignal's recommendation to use heat stretching to increase the tenacity of a braided structure is not surprising, as its Dunbar Patent predated the meeting by several years.  A1574-1612.

After the meeting and before October 5, 1994, AlliedSignal heat stretched some of Pure Fishing's Gorilla Braid fishing line at a draw ratio of 2.1 and a temperature of 155°C.  A1520; A1672-76; *see also* A1768; A1770.  AlliedSignal's heat stretching substantially increased tenacity.  A1520; A1671-73; A1771-73; A1974-76.  Cook knew of AlliedSignal's heat stretching work and recommendations before October 5, 1994.  A3079-80; A3084; A3274; A7961-62. AlliedSignal and Pure Fishing did not collaborate further because AlliedSignal was supplying Spiderwire, then Pure Fishing's main competitor.  A1734-35.

Pure Fishing turned to DSM, the maker of Dyneema.  Foote visited DSM before October 4, 1994.  A1738-40; A1975-76.  DSM recommended that Pure Fishing use heat stretching to increase the tenacity of braided GSP fishing lines. A1975-76; A3071-72; A3658.  Foote's October 4, 1994 notebook entry records DSM's recommendation in detail:

DSM Trip....

(B)  Heat Setting.

they [DSM] recommend heat drawing finished braids. the temperature is

130±2ºC....

they recommend drawing of

A) up to 35% (length) (wt)

B) up to 15% of Breakload

their draw is to optimize braiding construction + extra draw of fiber
(reducing denier)

they ran tests on Gorilla braid before & after post draw at the 35% stretch.
Tensile kN/g/m went from 2.25 to 3.07. denier reduced 35%.

A1975-76.

Foote testified that, as his notebook records, DSM heat stretched some of
Pure Fishing's Gorilla Braid fishing line using its recommended parameters before
Cook's claimed October 5, 1994 conception date.  A1975-76; A1751-56.  DSM's
heat stretching increased tenacity.  *Id.*

DSM's recommendations and its heat stretching of Gorilla Braid match
claims 1, 4, and 5 of the Cook Patent.  A127:15:28-35; A3075-77.  Cook admitted
in his deposition that there was "no difference" between claim 1 and DSM's
recommendations.  A1719.  He confirmed that point at the inequitable conduct
trial, testifying that "DSM's heat stretching work matches claim 1 exactly."
A3296-97.  DSM's 1.35 draw ratio is also within the scope of claims 4 and 5.

## B.    Cook Derived His Claimed Invention From DSM

Foote told Cook of DSM's recommendations before Cook's claimed
conception date of October 5, 1994.  A1712; A1717-18; A1757-58; A3071-72.  On
October 5, 1994, Cook conducted his first heat stretching experiments on braided
GSP fishing line.  A1694-95; A1971-72.

10

Cook testified that October 5, 1994 was the first time he had ever heat stretched braided GSP lines, and that this work was "the start of all the work" that led to the Cook Patent.  A2989-90; *see also* A1695.  Cook labeled his October 5, 1994 notebook entry as "START POST DRAW", and confirmed that that entry was his "documented record of the first [ ] drawing experiments begun on the superline."  A1695; *see also* A1971-72.

Cook also personally identified October 5, 1994 as the conception date of the Cook Patent claims.  A1684-85; A1693-95; A1717.  Pure Fishing's interrogatory answers stated that October 5, 1994 was the conception date five separate times, and Pure Fishing never amended that answer.  A1886-1918.

Cook's testimony and his and Foote's notebook entries established that he derived his October 5, 1994 "conception" from DSM.  Cook agreed that "DSM [ ] was recommending to Dan Foote heat drawing of finished braids" and that DSM recommended the specific parameters he used on October 5, 1994.  A1713-18.  Cook's testimony and his October 5, 1994 notebook entry confirm that he followed DSM's recommendations exactly, using a temperature of 130°C and a draw ratio of 1.35 for his first heat stretching experiments.  A1713-18; A1971-72.  Cook testified that he did so based on DSM's recommendations:

> Q.  And just to put us back in context 1181 — page 1181 is your October 5, 1994 lab notebook entry showing the first time that Berkley did heat stretching of the braid; correct?  Just to put us back in context.
>
> A.  Yes.
>
> Q.  And this is the document that was identified as — this is the conception date of the '214 patent, October 5, '94; right?

11

A.  Right.

Q.  And so it's the day after Mr. Foote's notebook entry which I understand comes after he's back from the DSM trip; correct?

A.  Yes.

Q.  And Mr. Foote says that DSM recommends drawing at 130 degrees; correct?

A.  Correct.

Q.  And that's what you did on October 5th.  Your first entry indicates drawing at 130 degrees; correct?

A.  Correct.

Q.  And you did that because that's what DSM recommended; right?

A.  I must assume that's correct.

Q.  And DSM also recommended drawing it at 35 percent.  And that's what you did; right?  On October 5th you drew it 1.35?

A.  Yes.

Q.  And again, you did that because that's what DSM recommended to Mr. Foote to do; correct?

A.  That's what Dan Foote recommended as a starting point.

A1717-18; *see also* A3077-78.

Cook testified repeatedly at his deposition that he did not conceive of the invention claimed in the Cook Patent.  A1696-1704.  Initially, Cook testified that "it was DSM's idea to use heat stretching to improve the tenacity."  A1696.  Immediately after a break in the deposition, Cook "clarified" his testimony by noting that he did not know whether Foote, DSM, or AlliedSignal had the idea to

use heat stretching to improve the tenacity of a fishing line; but he made clear that

it was not his idea:

> Q.  And what you're saying now is you don't know who suggested drawing
> the fishing line to increase tenacity, whether it was AlliedSignal or Dan
> Foote or DSM or Dan Foote.  You just don't know?
>
> A.  No.
>
> Q.  Is that correct?
>
> A.  Right
>
> * * *
>
> Q.  And what you originally told me was that AlliedSignal suggested heat
> stretching to increase the tenacity of the fishing line; correct?
>
> A.  Yes.
>
> Q.  And what you originally told me was DSM suggested heat stretching the
> fishing line to increase the tenacity; correct?
>
> A.  Yes.
>
> Q.  And now you're changing your testimony to say that you don't know
> who suggested heat stretching the fishing line to increase tenacity; correct?
>
> A.  Correct.
>
> Q.  And both of these events occurred before October 5, 1994, your
> conception date; correct?
>
> A.  Yes.
>
> * * *
>
> Q.  ... I understand your testimony now to be either Dan Foote or
> AlliedSignal suggested heat stretching to increase tenacity and you don't
> know which one?

A. Right.

Q. But it wasn't you?

A. Right.

Q. And same with DSM. Either Dan Foote or DSM suggested the heat stretching process to increase tenacity, but it wasn't you?

A. Right.

A1702-04. Cook repeated that testimony at the inequitable conduct trial. A3079-80.

Cook never tried to claim credit for inventing the subject matter of claims 1, 4, and 5. Instead, when asked what he thought he had invented, he testified that he "pushed the draw ratios to a high level." A1697. The Cook Patent claims a draw ratio starting at the lowest possible level, "about 1.0," and the asserted claims match DSM's recommended draw ratio. Cook also said that "[w]hat we came up with was a process for making a braided fishing line high tenacity," but admitted "that's what DSM and AlliedSignal both told [him] to do." A1697-98. The Cook Patent claims cover any increase in tenacity, not just "high tenacity" lines. A127:15:28-35, 42-49.

Cook's testimony and notebook entries were further corroborated by records produced during the inequitable conduct trial.[3] On October 7, 1994, Foote sent a fax to Pure Fishing's patent attorney, Lance Johnson, copying Roger Cook and summarizing an October 5, 1994 phone call. A7961-62. That fax states, with regard to the use of a "Second Stage of Draw" (heat stretching the braided line):

---

[3]     Pure Fishing withheld these records based on a claim of privilege, but the District Court ordered their production during the inequitable conduct trial.

14

"Both DSM and AlliedSignal have told us about it and recommend the use of this process." A7961. Cook also told Johnson that his October 5, 1994 experiment was "suggested by DSM" and that "Our first drawing began 5 Oct. 94 at these conditions" recommended by DSM. A7963, A8035; *see also* A3277-78; A3289; A3293-95. That first conversation is recorded in Johnson's contemporaneous notes (A7963), and the second is recorded in Cook's notes of a phone call on October 1, 1996, the eve of filing the application for the Cook Patent (A8035).

## V.    PURE FISHING'S REFUSAL TO ABANDON ITS CLAIM OF INFRINGEMENT AFTER ROGER COOK'S DEPOSITION HAD MADE CLEAR THAT COOK WAS NOT THE INVENTOR OF THE COOK PATENT

Normark deposed Roger Cook on April 11-12, 2012. Immediately after the deposition, Normark's counsel explained to Pure Fishing's counsel that Cook's testimony made clear that the Cook Patent was invalid because Cook was not the inventor. A3774-76. Normark's counsel followed up with a letter on April 18, 2012 demanding that Pure Fishing dismiss its lawsuit because Cook's testimony and the documents discussed at his deposition had established that Cook was not the inventor of the Cook Patent claims. *Id.* Pure Fishing refused. *Id.* When Normark suggested that the parties would be better served by a mutual walk-away, Pure Fishing responded by threatening to sue Normark's supplier in Taiwan on the substantively identical Taiwanese counterpart to the Cook Patent, a threat it ultimately carried out, and by making exorbitant settlement demands. A3775, ¶ 6. Pure Fishing thus forced Normark to complete discovery and move for summary judgment, which Normark did in August of 2012.

## VI.   NORMARK'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

Normark moved for summary judgment that the Cook Patent was invalid under 35 U.S.C. § 102(f) because Roger Cook was not the inventor of the Cook Patent claims.  Pure Fishing's response did not dispute that, before the October 5, 1994 conception date, DSM had recommended and performed heat stretching as claimed in the Cook Patent, and Pure Fishing also did not dispute Cook's testimony that he had derived his alleged October 5, 1994 conception from DSM.  In fact, Pure Fishing did not offer any evidence from Roger Cook to contest Normark's derivation argument.  *See* Dist. Ct. Dkt. 244.

Instead, Pure Fishing contradicted Cook's testimony, Cook's and Foote's notebook entries, and Pure Fishing's own interrogatory answers by arguing that Cook's conception date was not October 5, 1994.  Pure Fishing claimed that Cook had performed relevant heat stretching work in May 1993, before DSM.  Dist. Ct. Dkt. 244, pps. 4, 11-14.

Pure Fishing's claim that Cook's heat stretching work predated DSM was based solely on two pages from Cook's notebook from May of 1993 and a one-page summary related to Cook's May 1993 work from Foote's notebook.  Dist. Ct. Dkt. 244, p. 13, *citing* A2430-2432, A2434.  Pure Fishing attempted to argue that Cook's May 1993 work constituted a prior conception of the Cook Patent claims, predating DSM's recommendations and heat stretching work.[4]  Dist. Ct. Dkt. 244,

---

[4]    Pure Fishing also relied on Dan Foote's belief that Cook had been working on heat stretching braided GSP line before Foote's visit to DSM.  Dist. Ct. Dkt. 244, p. 7-8.  Foote did not identify any specific work by Cook to support his belief, and he did not have personal knowledge of the details of Cook's work; indeed everything Foote testified to or wrote in his notebook

p. 11-14.

Pure Fishing's response was an attempt to mislead the District Court. Cook's May 1993 work had nothing to with "heat stretching," and did not have the elements required by the Cook Patent claims. As discussed above in part IV, Cook repeatedly testified that his first experiment ever with heat stretching braided GSP lines occurred not in May 1993, but on October 5, 1994. Cook testified unequivocally that his May 1993 work was not a prior conception of the Cook Patent claims. A3307.

Cook's May 1993 work involved "heat relaxing," also referred to as "heat setting" in his notebook. A2430-32; A2725-26. "Heat relaxing" or "heat setting" is not "heat stretching." A2294, ¶ 2; A2297-98, ¶¶ 8-9. Cook had explained at his deposition and in trial testimony that his May 1993 work involved holding a braided GSP line at a constant tension between the rollers, and that this was "not drawing it." A3129; A3301-02; A2724-29.

Cook's May 1993 notebook pages corroborate Cook's testimony that his May 1993 work did not involve stretching the line. Cook's notebook refers to a "Rate-10 meters/min," without referring to any other rate. A2430-32, A2434. Because the output roller was not set at a higher speed than the input roller, Cook's May 1993 work did not involve "drawing," confirming what Roger Cook had stated at the inequitable conduct trial. A3129; A3301-02. Cook's May 1993 work thus did not involve the positive draw ratio required by the Cook Patent claims. Cook's May 1993 notebook entry and Foote's summary do not contain any

about Cook's work he learned from Cook. A2732-37.

17

reference to any stretching of the line or to a positive draw ratio, and also do not contain any reference to increasing tenacity. A2430-32; A2434.[5]

Pure Fishing also relied on testimony from its expert, Egbert van Gorp. Van Gorp, who was DSM's research and technology manager in 1994, claimed that DSM did not have "independently developed know-how and technology" concerning the use of heat stretching with fishing lines.[6] A2450. However, van Gorp had no recollection of the meeting between Foote and DSM and could not testify about DSM's recommendations to Foote. A2746-51. Van Gorp did not deny that, before October 5, 1994, DSM had recommended that Pure Fishing use heat stretching to increase the tenacity of braided fishing line, recommending the exact parameters claimed by Pure Fishing in the Cook Patent claims. A2750-51. Van Gorp also did not deny that DSM had actually performed heat stretching using those exact parameters, before October 5, 1994. *Id*.

The District Court granted summary judgment to Normark on December 11, 2012. A2916-60. The Court ruled as a matter of law that Roger Cook was not the true inventor of the Cook patent claims, stating that Pure Fishing had come forward with "*no evidence* that Cook had reduced his invention to sufficiently

---

[5]     At the inequitable conduct trial, Foote claimed that a review of the May 1993 documents showed a very slight positive draw ratio. A3618-19. The documents don't say anything about a positive draw ratio, and Foote based his assertion on his estimate of the pre-treatment denier of the braid compared to the post-treatment denier. *Id*. He did not claim that the rollers had been set at a positive draw ratio as required by the Cook Patent claims, and he admitted that he did not make this calculation until the lawyers suggested he do so in connection with the May 2013 inequitable conduct trial. A3649-50.

[6]     Given DSM's Hogenboom Patent, van Gorp's testimony that DSM lacked know-how concerning heat stretching is simply bizarre.

concrete form prior to October 1994 to claim conception on his own prior to receiving specific instructions from DSM . . . ." A2945 (emphasis added). The District Court also granted summary judgment to Normark on two additional grounds, ruling that Pure Fishing's manufacture and sale of the 1995 Fireline Fused product more than one year before the Cook patent application invalidated the patent under Section 102(b), and that the combination of the Dunbar Patent's Example 7 with 1995 Fireline Fused and the Hogenboom Patent invalidated the Cook Patent claims under Section 103. A2951, A2954.

Pure Fishing appealed the District Court's summary judgment order. Fed. Cir. Dkt. No. 13-1655. This Court issued a *per curiam* ruling affirming the District Court's summary judgment order. Fed. Cir. Dkt. No. 13-1655, No. 39.

## VII.  THE INEQUITABLE CONDUCT TRIAL

In April and May 2013, the District Court held a bench trial on Normark's inequitable conduct counterclaim. The three-and-a-half day trial included testimony by Cook, Foote, and Pure Fishing patent attorney Lance Johnson. The District Court found that Pure Fishing had made three separate material misrepresentations to obtain the Cook Patent: (1) Pure Fishing had falsely claimed that Roger Cook was the inventor of the Cook Patent claims; (2) Pure Fishing had failed to disclose the invalidating sales of 1995 Fireline Fused; and (3) Pure Fishing had made false statements concerning DSM's Hogenboom Patent during prosecution. A3739-40. The District Court, however, held that Normark had not proven by clear and convincing evidence that either Roger Cook or Lance Johnson had acted with the specific intent to deceive the Patent and Trademark Office, and

thus rejected Normark's counterclaim.  A3745.  Normark did not appeal the inequitable conduct ruling.

## VIII. THE DISTRICT COURT'S ORDERS ON NORMARK'S MOTIONS FOR ATTORNEYS' FEES

After judgment was entered, Normark made a timely motion for attorneys' fees and costs pursuant to Fed. R. Civ. P. 11, 35 U.S.C. § 285, and the District Court's inherent power.  Dist. Ct. Dkt. 353.  In support of its motion under Section 285, Normark argued under then-prevailing law that it had shown by clear-and-convincing evidence that the case was exceptional—that it was objectively baseless and brought in subjective bad faith.  Dist. Ct. Dkt. 364 at 4.  Normark argued that Pure Fishing's claim that Roger Cook was the true inventor of the Cook Patent claim was objectively baseless, given the overwhelming and uncontradicted evidence in the case.  *Id*. at 5-11.  Normark argued that Pure Fishing's claims were brought with subjective bad faith because Pure Fishing knew or should have known, before commencing the suit, that Cook was not the true inventor.  *Id*. at 20.  Normark further argued that Pure Fishing acted in bad faith by persisting in the lawsuit after Cook's deposition had made clear that Roger Cook was not the true inventor of the Cook Patent claims.[7]  *Id*. at 21-22.

With regard to its request for Rule 11 sanctions, Normark noted that Section 285's then-governing objective baselessness standard was substantially identical to Rule 11's objective reasonableness standard.  *Id*. at 26.  Thus, for the same reasons that Pure Fishing's claim of Cook's inventorship justified a fees

---

[7]    Normark also based its exceptional case motion on Pure Fishing's arguments concerning the validity of the Cook Patent claims over 1995 Fireline Fused, but has chosen to focus this appeal solely on the inventorship issue.

award under Section 285, Rule 11 sanctions were also justified. *Id.*

The District Court denied Normark's Section 285 and Rule 11 motions. The District Court found it significant that Normark's motion related to an affirmative defense asserted by Normark, which required proof by clear and convincing evidence. A55. The District Court's order contained no real analysis of the basis for Pure Fishing's position that Roger Cook was the true inventor of the Cook Patent claims, stating only the following:

> Certainly, in light of Cook's statements in his deposition, Pure Fishing had an uphill battle to overcome the invalidity defense based on lack of inventorship. However, given the applicable standard of proof, Pure Fishing's argument that the input and assistance received from third-parties did not defeat Cook's claim of inventorship was not so unreasonable as to be one on which no reasonable litigant could expect to succeed. *See* Dkt. No. 244 at 17-18. Pure Fishing's arguments based on Cook's possibly flawed recollection (nearly twenty years after the patent issued) and limited understanding of patent law, as well as Foote's possibly contradictory testimony were, likewise, not so unreasonable that they satisfied this standard.

A56-57. The District Court determined that Normark had failed to meet the test for subjective bad faith "for many of the same reasons" that objective baselessness was not established. A57. Given the pendency of the *Octane Fitness* and *Highmark* cases, the District Court made an alternative ruling under the preponderance of the evidence standard. A57, n. 35. Finally, the Court denied Normark's Rule 11 motion "[f]or the same reasons" that it did not find PFI's claims to be objectively baseless. A58.

Normark appealed the District Court's order on February 14, 2014. Fed. Cir. Dkt. No. 14-1300, Dkt. 1. On April 29, 2014, the United States Supreme Court issued its decisions in *Octane Fitness*, *LLC v. ICON Health & Fitness, Inc.*,

134 S.Ct. 1749 (2014), and *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S.Ct. 1744 (2014). Those cases modified the standard for determining a prevailing party's entitlement to an award of costs and fees under Section 285.

On July 17, 2014, this Court stayed Normark's appeal pending a limited remand to the District Court for reconsideration of its Section 285 decision. Fed. Cir. Dkt. No. 14-1300, Dkt. 28. This Court retained jurisdiction over Normark's appeal of the Rule 11 and inherent-authority motions. *Id*.

Normark renewed its Section 285 motion on August 28, 2014. Dist. Ct. Dkt. 391. The District Court's October 28, 2014 order denied Normark's motion. The District Court repeated its view that it was significant to Normark's Section 285 motion that Normark had prevailed on an affirmative defense on which Normark had the burden of proof by clear and convincing evidence. A10. The District Court also noted that Normark did not win every issue in the case, as Normark had admitted that Yao I used a literally infringing method for a period of time and Normark had lost its inequitable conduct counterclaim. A10; *see* A2251-54 (Normark's stipulation to literal infringement for sales occuring before November 30, 2010).

The District Court again did not substantively discuss whether Pure Fishing's claim that Roger Cook was the true inventor of the Cook Patent claims met the standards for an exceptional case. The District Court stated only that the arguments advanced by Pure Fishing "were not frivolous" given the high standard of proof, and that "the court does not find Pure Fishing's position to be so weak as to warrant an award of fees." A10. The District Court also found that Pure

Fishing did not act "in an unreasonable manner in the way in which it litigated the Cook Claims." *Id*.

Normark again appealed the District Court's attorney fees ruling. Fed. Cr. Dkt. 15-1167. Pure Fishing cross-appealed the District Court's award of additional fees to Normark for Pure Fishing's Kelley Patent claim. Fed. Cir. Dkt. 15-1168. On December 12, 2014, this Court lifted its stay of the Rule 11 appeal, consolidated all the appeals, and set a briefing schedule. Fed. Cir. Dkt. 14-1300, Dkt. 35.

## SUMMARY OF THE ARGUMENT

This has been a truly exceptional case. Pure Fishing never had any legitimate basis to sue Normark for infringement of the Cook Patent. The sole named inventor, Roger Cook, freely admitted that he was not the inventor of the Cook Patent claims. Cook's testimony and detailed documentary evidence proved that Cook had derived the invention claimed in the Cook Patent claims from DSM. Pure Fishing never offered even a scintilla of evidence that would support a claim that Roger Cook was the true inventor of the Cook Patent claims.

Pure Fishing knew or should have known that Roger Cook was not the true inventor of the Cook Patent claims before it ever filed suit against Normark—all it had to do was ask Roger Cook. Pure Fishing certainly knew that Cook was not the inventor after his April 2012 deposition, but nevertheless refused to drop its infringement claim. Pure Fishing instead advanced a theory of prior conception that had no basis in fact or law, and that Cook himself clearly and unequivocally rejected.

Section 285 of the Patent Act exists for just this type of case—the whole purpose of the law is to compensate the prevailing party for having to bear the heavy costs of meritless patent litigation. *Highmark, Inc. v. Allcare Health Mgmt. Sys.*, 687 F.3d 1300, 1310 n. 1 (Fed. Cir. 2012), *rev'd on other grounds*, 134 S.Ct. 1744 (2014); *see also Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1372-73 (Fed. Cir. 2012) (Reyna, J. concurring). The District Court nevertheless rejected Normark's Section 285 motion.

The District Court's October 28, 2014 Order is an abuse of discretion, and

should be reversed.  The District Court's finding that Pure Fishing's claim of inventorship was not sufficiently weak to warrant an exceptional case finding completely ignored the overwhelming and uncontradicted evidence that Roger Cook was not the inventor, and also ignored the governing law of conception.  The District Court's finding that Pure Fishing did not litigate the case in an unreasonable manner was also clearly erroneous, as it was uncontested that Pure Fishing filed its lawsuit without any legitimate basis to claim that Roger Cook was the inventor, and it was also uncontested that Pure Fishing persisted in its lawsuit long after Cook's deposition had established the invalidity of the Cook Patent claims.

The District Court's Section 285 ruling should also be reversed because it was based on two errors of law.  First, the District Court erroneously carved out an affirmative defense exception to the exceptional case standard, contrary to the clear teachings of *Octane Fitness*.  Under *Octane Fitness*, Pure Fishing's meritless position on Cook's inventorship makes this an exceptional case, regardless of the fact that Normark bore the burden of proof on that issue.  Second, the District Court misinterpreted *Octane Fitness* as requiring proof of either "objective baselessness" or "subjective bad faith."  The exceptional case standard does not require either showing, but rather requires only a showing that the plaintiff's litigating position was uncommonly weak or that the plaintiff litigated the case in an unusually unreasonable manner.

The District Court's January 21, 2014 Order denying Normark's Rule 11 motion should also be reversed.  Pure Fishing and its counsel, Marc Manos and

Nexsen Pruet, presented pleadings and other papers alleging infringement of the invalid Cook Patent and alleging that Roger Cook was the inventor, and persisted in that position after Cook's deposition in April 2012.  Pure Fishing's inventorship position was without legal foundation, and Pure Fishing and its counsel violated Fed. R. Civ. P. 11.  The District Court's Order denying Normark's Rule 11 motion improperly ignored the overwhelming and uncontradicted evidence establishing the Rule 11 violation, and should be reversed.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court applies "an abuse-of-discretion standard in reviewing all aspects of a district court's § 285 determination."  *Highmark*, 134 S.Ct. at 1749.  While this Court is deferential to the District Court, "[t]he abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error:  'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'"  *Id*. (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

An abuse of discretion occurs when (1) the district court's decision is clearly unreasonable, arbitrary, or fanciful, (2) the court's decision is based on an erroneous construction of the law, (3) the court's factual findings are clearly erroneous, or (4) the record contains no evidence upon which the court rationally could have based its decision.  *See W. Elec. Co. v. Piezo Tech., Inc.*, 860 F.2d 428, 430–31 (Fed. Cir. 1988).

26

A factual finding is clearly erroneous "when, 'although there is evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1338–39 (Fed. Cir. 2001) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In determining whether Rule 11 sanctions are warranted, the Federal Circuit applies the law of the regional circuit. *Antonious v. Spalding & Evenflo Cos. Inc.*, 275 F.3d 1066, 1072 (Fed. Cir. 2002). In the Fourth Circuit, Rule 11 decisions are reviewed for an abuse of discretion. *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 150 (4th Cir. 2002). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Brubaker v. City of Richmond*, 943 F.2d 1363, 1374 (4th Cir. 1991).

## II.  THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING NORMARK'S EXCEPTIONAL CASE MOTION

### A.    THE *OCTANE FITNESS* STANDARD

This Court adopted a strict approach to Section 285 motions in 2005, holding that absent misconduct in conduct of the litigation or in securing the patent, fees may be imposed against the patentee "only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Brooks Furniture Mfg., Inc. v. Dutailier Int'l., Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). This Court subsequently explained that litigation is objectively baseless only if it is "so unreasonable that no reasonable litigant could believe it would succeed." *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011).

The Supreme Court reversed the *Brooks Furniture* standard in *Octane*

*Fitness*, finding that it was unduly rigid and "impermissibly encumbers" the statutory grant of discretion given to district courts by Section 285. *Octane Fitness*, 134 S.Ct. at 1755. Section 285 states: "The Court in exceptional cases may award reasonable attorney fees to the prevailing party." The Supreme Court held that Section 285's language is clear, imposing only one constraint on the district court's discretion to award attorneys' fees: "The power is reserved for 'exceptional' cases." *Octane Fitness*, 134 S.Ct. at 1756.

The Supreme Court construed "exceptional" consistent with its ordinary meaning as "uncommon", "rare", or "not ordinary." *Id*. Based on this statutory construction, the Supreme Court announced a new exceptional case standard:

> We hold, then, that an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.

*Id*. Thus, a case is "exceptional" if a party's litigating position is uncommonly weak, or if a party litigates the case in an unusually unreasonable manner. *Id*.

The Supreme Court further instructed that district courts should determine whether a case is "exceptional" based on the totality of the circumstances. *Id*. The Supreme Court ruled that the standard of proof on a Section 285 motion is preponderance of the evidence, rejecting the clear and convincing standard previously applied by this Court. *Id*. at 1758.

The Supreme Court rejected the *Brooks Furniture* test partly because it was so demanding that it rendered Section 285's fee-shifting provision "largely superfluous." *Id*. at 1756, 1758. The first prong's requirement of objective baselessness was superfluous, because the district courts already have power to

28

award fees as a sanction for objectively baseless claims under Fed. R. Civ. P. 11.
*Morris v. Wachovia Secs., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006); *see also Raylon*,
700 F.3d at 1370 (noting that Rule 11 standard is substantially identical to the
objective baselessness prong of the *Brooks Furniture* exceptional case standard).
Requiring subjective bad faith was superfluous, because district courts already
have the inherent power to award attorneys' fees as a sanction for bad faith
litigation conduct. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240,
258-59 (1975).

### B.    THE DISTRICT COURT'S OCTOBER 28, 2014 ORDER SHOULD BE REVERSED BECAUSE IT IS BASED ON CLEARLY ERRONEOUS FACTUAL FINDINGS AND ERRORS OF LAW

**1.    The District Court's finding that Pure Fishing's position on inventorship was not sufficiently weak to warrant an exceptional case finding improperly ignored the evidence and the law of conception**

The Supreme Court held that a case is exceptional if it "stands out from
others with respect to the substantive strength of a party's litigating position
(considering both the governing law and the facts of the case)." *Octane Fitness*,
134 S Ct. at 1756. Pure Fishing's lawsuit depended entirely on its litigating
position that Roger Cook was the true inventor of claims 1, 4, and 5 of the Cook
Patent. The District Court found that Pure Fishing's position concerning Cook's
inventorship was not "frivolous" and was not "so weak as to warrant an award of
fees." A10.

The District Court's finding is clearly erroneous. The District Court ignored
the fact that Roger Cook repeatedly admitted that he did not invent the Cook Patent

claims, that the documentary evidence established that Cook was not the inventor, and that Pure Fishing had absolutely no evidence to support its arguments on inventorship. The District Court's order also ignored the governing law of conception, under which Pure Fishing's claim of inventorship should have been evaluated.

The relevant law on derivation and conception is well-settled and was not the subject of controversy below. "Derivation" required Normark to prove by clear and convincing evidence that 1) DSM conceived of the claimed invention before Roger Cook's claimed October 5, 1994 conception date, and 2) DSM's prior conception was communicated to Cook. *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1313 (Fed. Cir. 2011); *see also* A2942 (District Court's recitation of the standard for finding derivation when ruling on summary judgment). To claim prior conception and defeat Normark's derivation argument, Pure Fishing had to have evidence that Roger Cook had "a definite and permanent idea of the complete and operative invention" before DSM. *Mergenthaler v. Scudder*, 11 App. D.C. 264, 276, 1897 WL 17698, at *6 (D.C. Cir. 1897); *see also Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir. 1985).

As outlined above in the Statement of the Case, *supra*, Roger Cook admitted that he did not invent claims 1, 4, and 5 of the Cook Patent. Cook's notebook, Dan Foote's notebook, and other documents corroborated Cook's testimony in detail. In summary, Cook's testimony and the documents established that: 1) Cook personally identified October 5, 1994 as his "conception" date for claims 1, 4, and 5; 2). October 5, 1994 was the first time that Cook experimented with heat

stretching of braided GSP lines, and Cook identified his October 5, 1994 notebook entry as the "documented record of the first [] drawing experiments that Berkley ever did on Superline" and "the start of all the work" that led to the Cook Patent; 3) before October 5, 1994, DSM recommended to Dan Foote that Pure Fishing use heat stretching to increase tenacity of braided GSP fishing lines, recommending the exact parameters claimed in the Cook Patent; 4) before October 5, 1994, DSM also performed heat stretching to increase the tenacity of a braided GSP fishing line using those same parameters; 5) Foote communicated DSM's recommendation to Cook; 6) Cook admitted that he based his October 5, 1994 "conception" on DSM's recommendations; and 7) Cook testified that it was not his idea to use heat stretching to increase tenacity as claimed in the Cook Patent claims, instead crediting both AlliedSignal and DSM with having that idea before he did. *See* Statement of the Case, *supra* Part IV.

Pure Fishing never disputed a word of the documentary and testimonial evidence establishing that Cook derived his October 5, 1994 "conception" from DSM. Instead, Pure Fishing's litigating position depended entirely on contradicting Roger Cook's testimony and the relevant documents, in order to argue that Cook's May 1993 work constituted a prior conception of the Cook Patent claims.

For that argument to have any substantive strength under the governing law, Pure Fishing had to have some evidence that would support a finding that, in May 1993, Roger Cook had "a definite and permanent idea of the complete and operative invention" claimed in the Cook Patent. *Mergenthaler*, 1897 WL 17698,

at *6.  That is, to avoid an exceptional case finding, Pure Fishing had to have some evidence that in May 1993, Roger Cook had a definite and permanent idea of the complete and operative invention, as set forth in claims 1, 4, and 5 of the Cook Patent.

But Pure Fishing did not have any evidence that Cook's May 1993 work constituted a prior conception of the claims of the Cook Patent.  The claims of the Cook Patent require heat stretching a braided GSP fishing line at a positive draw ratio to increase tenacity.  *See* A927 (construing draw ratio claim term as requiring a positive ratio of at least 1.01); *see also* A127 (claims 1, 4, and 5); A121:3:53-56 (defining "draw ratio" as the ratio of the output rollers to the input rollers acting on the line).

It cannot be overemphasized that Roger Cook himself denied that his May 1993 work constituted a prior conception of the Cook Patent claims.  *See, e.g.*, A3307.  Moreover, Cook always made it clear that his October 5, 1994 experiments were the very first time he ever experimented with heat stretching braided GSP lines, and he never wavered from his designation of October 5, 1994 as his conception date for the Cook Patent claims.

Cook also testified that his May 1993 work did not involve "heat stretching" at all, but instead involved "heat setting", a different process involving holding the line at a constant tension and "not drawing it."  A3129; A3301-02; A2724-29; *see also* Dist. Ct. Dkt. 364, pp. 10-11 and record materials cited therein.  Cook's notebook entry confirms that Cook's May 1993 work did not involve setting the rollers at a positive draw ratio, as required by the Cook Patent claims, and Cook's

and Foote's notebook entries concerning Cook's May 1993 work make no mention of the required elements of stretching, a positive draw ratio, or increasing tenacity.

Cook's own testimony and documents thus established that his May 1993 work do not provide any support for any argument by Pure Fishing that Roger Cook had a "definite and permanent idea of the complete and operative invention" *of the Cook Patent claims* in May 1993. *Mergenthaler*, 1897 WL 17698, at *6. Pure Fishing's reliance on Cook's May 1993 work did not provide any "substantive strength" to Pure Fishing's litigating position.

The District Court's finding that Pure Fishing's position on inventorship was not sufficiently weak to warrant an exceptional case finding is clearly erroneous. Pure Fishing's position was more than "weak"—it had absolutely no factual or legal basis. The District Court did not cite a single fact that would support any legitimate argument that Roger Cook was the inventor of the Cook Patent claims. The District Court did not do so, because no such fact exists. Because the District Court ignored the overwhelming and uncontested evidence establishing that Roger Cook was not the inventor of the Cook Patent claims, this Court should reverse the District Court's order and declare this an exceptional case. *See W. Elec. Co.*, 860 F.2d at 430–31 (an abuse of discretion occurs when there is no evidentiary support for the District Court's finding).

### 2. The District Court's finding that Pure Fishing did not litigate the Cook Patent claim in an unreasonable manner is also clearly erroneous

Under *Octane Fitness*, a case is exceptional if it is litigated in an unusually unreasonable manner. 134 S. Ct. at 1756. Moreover, proving that a party litigated

in an unreasonable manner requires a lesser showing than "bad faith", because otherwise Section 285 would be superfluous. *Id.* at 1756, 1758. The District Court ruled that Pure Fishing did not "[act] in an unreasonable manner in the way it litigated the Cook Claims. . ." A10. That finding is also clearly erroneous.

Pure Fishing never should have filed suit on the Cook Patent, because Pure Fishing knew or should have known that Roger Cook was not the true inventor of the Cook Patent claims. Even the most rudimentary pre-filing due diligence, interviewing Cook and reviewing his and Foote's notebooks for the relevant time period, would have revealed that Cook derived the Cook Patent claims from DSM. Pure Fishing did not even have to do the work of piecing together the evidence from Cook's and Foote's notebooks, as Pure Fishing's very first letter to its patent attorney, Lance Johnson stated that "Both DSM and AlliedSignal have told us about it (referring to heat stretching braided GSP lines) and recommend the use of this process." A7961.

Pure Fishing's refusal to drop the Cook Claim after Cook's April 2012 deposition also constituted unreasonable litigation conduct. Immediately after Cook's deposition, Normark's counsel explained to Pure Fishing's counsel that Cook's testimony had invalidated the Cook Patent. Normark followed up with a detailed letter on April 18, 2012, making the same points in considerable detail and demanding that Pure Fishing drop the lawsuit. A3778-3780. Pure Fishing refused.

Pure Fishing and its counsel should never have filed this lawsuit, and had an obligation to dismiss it after the Cook deposition. *See, e.g., Bayer CropScience AG v. Dow AgroSciences LLC*, 2015 WL 108415, at *4 (D. Del. Jan. 5, 2015).

Instead, Pure Fishing compounded the harm by asserting the manifestly unreasonable position that Roger Cook's May 1993 work constituted a prior conception, even though Roger Cook himself denied it and even though Cook's May 1993 work had nothing to do with heat stretching.

Normark made all of these points in its Section 285 motion. *See* Dist. Ct. Dkt. 391-1. Pure Fishing's response brief completely ignored Normark's arguments on this issue, arguing only that it continued to press the Cook Patent claim after Cook's deposition because its position was "meritorious." *See* Dist. Ct. Dkt. 395, pp. 22-23. The District Court's order did not even bother to discuss the substance of Normark's arguments, dismissing them with a single sentence finding that Pure Fishing's litigation conduct was not "unreasonable." A56. The District Court's finding that Pure Fishing did not litigate this case in an unreasonable manner is clearly erroneous, and this Court should reverse that order for this additional reason.

### 3.     The District Court's order should also be reversed because it is based upon errors of law

The District Court's order relied on the fact that Normark prevailed on the affirmative defense of invalidity, a defense that Normark had to prove by clear and convincing evidence. A10. The District Court had emphasized this point in its pre-*Octane Fitness* ruling. A55. The District Court also noted that Normark did not prevail on every issue in the case. A10.

The District Court's ruling is contrary to *Octane Fitness*. Under *Octane Fitness*, a case is "exceptional" if a party's litigating position is unusually lacking

35

in substantive strength under the facts and the governing law. *Octane Fitness*, 134 S Ct. at 1756. A case is also exceptional if the party has litigated the case in an unreasonable manner. *Id.* District courts should of course take into account the burden of proof when evaluating the substantive strength of a party's position, as that is part of the governing law. *Id.* But there is no "affirmative defense" exception to the exceptional case standard set forth in *Octane Fitness*, nor does the exceptional case standard require Normark to prevail on every issue. *Id.*

The proper question under *Octane Fitness* concerns the substantive strength of the party's litigation position on any important issue. To hold otherwise would mean that a patent plaintiff would be immune from an exceptional case finding, no matter how meritless its position on the affirmative defense of invalidity or unenforceability. This Court has, of course, repeatedly found that a defendant that prevails on an invalidity defense, or other defenses on which it bears the burden of proof, can be entitled to recover attorneys' fees under Section 285 if the plaintiff's position or litigation conduct rendered the case exceptional. *See, e.g.*, *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1325-27 (Fed. Cir. 2013); *Transonic Sys., Inc. v. Non-Invasive Med. Techs. Corp.*, 75 F. App'x 765, 784 (Fed. Cir. 2003); *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 455 (Fed. Cir. 1985). *Octane Fitness* did not change that well-settled law.

Pure Fishing's claim that Roger Cook was the true inventor of the Cook Patent claims was central to the lawsuit; indeed Pure Fishing could not legitimately bring the lawsuit at all unless it had a reasonable basis for contending that Cook was the inventor and that its Cook Patent was therefore a valid patent. *View Eng'g,*

*Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000). As outlined above, the District Court ignored the fact that Pure Fishing had no evidence to support its position that Roger Cook was the true inventor. The District Court's reliance on the fact that Normark had the burden of proving invalidity effectively immunized Pure Fishing from exceptional case liability, and allowed the District Court to improperly disregard the complete lack of merit in Pure Fishing's position. The District Court's ruling is therefore contrary to the legal standards set forth in *Octane Fitness*, and should be reversed.

The District Court made another error of law by interpreting *Octane Fitness* as requiring proof of *either* objective baselessness *or* subjective bad faith. A3-4. The District Court relied on a quotation from *Octane Fitness* that "a case presenting *either* subjective bad faith *or* exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id*. (quoting *Octane Fitness*, 134 S. Ct. at 1757) (emphasis added by the District Court). The District Court thus seemingly interpreted *Octane Fitness* as changing the *Brooks Furniture* standard from one requiring proof of *both* objective baselessness and subjective bad faith to a standard requiring proof of *either* objective baselessness *or* subjective bad faith.

The District Court's interpretation of *Octane Fitness* is legal error. The *Octane Fitness* standard does not require a showing of either "objective baselessness" or "subjective bad faith." The quotation that the District Court relied on simply gave *examples* of conduct that would meet the exceptional case

standard.[8]  *See, e.g.*, *Lending Tree, LLC v. Zillow, Inc.*, 2014 WL 5147551 at *9 (W.D.N.C. Oct. 9, 2014) (reciting nonexclusive list of factors that may make a case exceptional).  Rather, the Supreme Court lowered the exceptional case standard concerning meritless legal positions from "objective baselessness" to cases that "stand[ ] out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case). . ." 134 S. Ct. at 1756.  To be an exceptional case, the offending party's position just needs to be uncommonly or unusually weak, not "objectively baseless", and the Supreme Court took pains to point out that Section 285's standard would otherwise merely duplicate Fed. R. Civ. P. 11. 134 S. Ct. at 1756, 1758.  Similarly, the offending party's litigating conduct does not have to show subjective bad faith, but rather need only be uncommonly unreasonable, as otherwise Section 285's fee-shifting provision would merely duplicate the inherent power of the federal courts to award fees as a sanction for bad faith litigation conduct.[9]  *Id.*, *see also Alyeska Pipeline*, 421 U.S. at 258-59.

This Court should therefore reverse the District Court's October 28, 2014 order because it is based on errors of law.

---

[8]    While it is not necessary to Normark's exceptional case appeal, Normark does contend that Pure Fishing's position on inventorship was objectively baseless and violated Fed. R. Civ. P. 11.

[9]    The District Court's erroneous interpretation of *Octane Fitness* has been duplicated in other Section 285 decisions, suggesting a more widespread misunderstanding of the Supreme Court's holding.  *See, e.g.*, *Classen Immunotherapies, Inc. v. Biogen  Idec*, 2014 WL 2069653, at *3 n. 14 (D. Md. May 14, 2014) (interpreting *Octane Fitness* to require a showing of "objective baselessness" or "subjective bad faith").  Such an interpretation merely duplicates Rule 11 and the court's inherent power, respectively, and the Supreme Court rejected this approach in *Octane Fitness*.

## III.    THE DISTRICT COURT ERRED BY NOT USING ITS INHERENT AUTHORITY TO AWARD NORMARK RECOVERY OF ITS EXPERT WITNESS FEES

Normark's motion for recovery of attorneys' fees and expenses was also based on the District Court's inherent authority.  *See* Dist. Ct. Dkt. 364.  Because only the Section 285 motion was remanded, the District Court did not reconsider its decision to deny Normark's inherent authority motion.  It is Normark's understanding that Section 285 does not provide the authority to award expert witness fees.[10]  *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008).  It is typical, however, for the courts to use their inherent authority to award expert witness fees in cases where an exceptional case finding is made.  *See, e.g., iLor*, 631 F.3d at 1380; *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir.  2012).  For the same reasons that justify an exceptional case finding, Normark respectfully requests that this Court rule that Normark is entitled to recover its expert witness fees under the inherent authority of the courts, and remand that issue to the District Court for determination of the amount of Normark's recovery of expert witness fees.

## IV.    THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING NORMARK'S RULE 11 MOTION

Normark moved the District Court for sanctions against Pure Fishing's counsel—Marc Manos and the Nexsen Pruet law firm—under Fed. R. Civ. P. 11(b)(2) and (b)(3), and against Pure Fishing under Fed. R. Civ. P. 11(b)(3).  The District Court denied Normark's Rule 11 motion, and Normark appealed.  This

---

[10]    Section 285 does allow the District Court to award Normark its paralegal fees and nontaxable expenses, in addition to its attorneys' fees.  *Mathis v. Spears*, 857 F.2d 749, 759 (Fed. Cir. 1988).

Court retained jurisdiction and stayed the Rule 11 appeal while the District Court reconsidered its Section 285 ruling on remand.

This Court applies the law of the regional circuit when reviewing whether sanctions are warranted under Fed. R. Civ. P. 11. *Antonious*, 275 F.3d at 1072. In the Fourth Circuit, Rule 11 decisions are reviewed for an abuse of discretion. *Hunter*, 281 F.3d at 150.

"[S]ubstantial claims without legal foundation . . . [with] no factual or legal basis" are properly subject to Rule 11 sanctions. *In re Kunstler*, 914 F.2d 505, 517 (4th Cir. 1990). "The legal argument must have absolutely no chance of success under the existing precedent to contravene ... [R]ule [11(b)(2) ] ... [and f]actual allegations fail to satisfy Rule 11(b)(3) when they are unsupported by any information obtained prior to filing." *Morris*, 448 F.3d at 277 (internal quotation marks omitted).

Pure Fishing's factual contention that Cook was the true inventor of the Cook Patent had no evidentiary support, and was a violation of Rule 11(b)(3), which requires that "factual contentions have evidentiary support." Pure Fishing's legal contention that Cook was the true inventor was not "warranted by existing law" and constituted a violation of Rule 11(b)(2).

In denying Normark's motion for Rule 11 sanctions against Marc Manos and Nexsen Pruet, the District Court declined to hold that a reasonable attorney in like circumstances could not have believed Pure Fishing's invalidity arguments to be legally justified. A58 (quoting *Morris*, 448 F.3d at 277). The Court did not address the culpability of Pure Fishing for bringing claims that lacked evidentiary

support under Rule 11(b)(3).  The District Court abused its discretion when it denied Normark's request for Rule 11 sanctions.

There is no question that, after Cook's April 11-12, 2012 deposition, Pure Fishing's lawyers were aware of facts giving rise to Normark's Rule 11 claim.[11] Instead of facing the fact that Pure Fishing's claims had no legitimate legal or factual foundation, Manos and his firm violated Rule 11 by "insisting [on] a position that is no longer tenable."  Fed. R. Civ. P. 11(b) Advisory Committee's Notes to 1993 Amendments.  They continued to advocate the claims in Pure Fishing's complaint, they presented an amended complaint, they opposed Normark's motion for summary judgment of invalidity, and they prosecuted an unsuccessful appeal of the District Court's entry of judgment against Pure Fishing. *See* Statement of the Case, *supra* § V; *see also* Dist. Ct. Dkt. Nos. 155, 200, 208, 237, and 244.

By continuing to assert that Cook was the inventor of the Cook Patent claims, Manos and Nexsen Pruet violated both Rule 11(b)(2)'s prohibition on presenting unwarranted legal positions, and Rule 11(b)(3)'s prohibition on pressing unwarranted factual contentions.  Pure Fishing's claim that Cook was the true inventor had absolutely no evidentiary support, and was clearly contrary to the well-settled law of conception and inventorship.  The District Court's conclusion to the contrary reflects both an "erroneous view of the law" and "a clearly

---

[11]    Marc Manos and Nexsen Pruet replaced Steptoe & Johnson as Pure Fishing's counsel in December, 2011.  Normark requested Rule 11 sanctions against Manos and Nexsen Pruet accruing from April 12, 2012, after Cook's deposition.  Normark did not seek Rule 11 sanctions against Steptoe because Steptoe's withdrawal made it impossible for Normark to give Steptoe the opportunity to withdraw its sanctionable allegations, as required by Rule 11.

erroneous assessment of the evidence," and was an abuse of discretion.  *Brubaker*, 943 F.2d at 1374.

The District Court was also empowered to sanction the represented party—Pure Fishing—under Rule 11, if it found that the party is "responsible for the violation."  Fed. R. Civ. P. 11(c)(1).  The District Court did not have the power to sanction Pure Fishing for violations of Rule 11(b)(2), concerning whether its legal contentions were warranted by existing law.  Fed. R. Civ. P. 11(c)(5).  However, it is permissible (and justified) to hold Pure Fishing responsible under Rule 11(b)(3) for alleging and persisting in the allegations at issue here.

The District Court made no findings concerning Pure Fishing's culpability.  However, Pure Fishing certainly knew that Roger Cook was not the true inventor, and that that claim had no evidentiary support.  Pure Fishing employs Cook and Foote, and the records of these two employees were the primary source of information confirming that Cook was not the inventor.  *See* Statement of the Case, *supra* § IV.B.  The District Court failed to acknowledge Pure Fishing's role in bringing and doggedly maintaining a baseless infringement claim despite knowing full well that Roger Cook was not the inventor of the Cook Patent claims.  The District Court's failure constitutes "a clearly erroneous assessment of the evidence," and was an abuse of discretion.  *Brubaker*, 943 F.2d at 1374.

Normark respectfully requests that this Court rule that the conduct of Pure Fishing and its counsel violated Fed. R. Civ. P. 11, and remand to the District Court to award a proper sanction for Pure Fishing's misconduct from the inception of the lawsuit, and Marc Manos's and Nexsen Pruet's misconduct from April 12,

2012 onward.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Normark respectfully requests that this Court reverse the District Court's October 28, 2014 Order and grant the following relief:

1) A ruling that this is an exceptional case entitling Normark to recover its attorneys' fees and expenses under 35 U.S.C. §285;

2) A ruling that Normark is entitled to recover its expert witness fees under the court's inherent authority;

3) A ruling that Pure Fishing violated Fed. R. Civ. P. 11(b)(3) and that its counsel, Marc Manos and the Nexsen Pruet law firm, violated Fed. R. Civ. P. 11(b)(2) and (3); and

4) An order remanding the case to the District Court for determination of the amount of the award of fees and expenses due to Normark.

Dated:  January 21, 2015

Respectfully submitted,

By  s/Michael Weinbeck
J. Thomas Vitt (0183817)
Shannon L. Bjorklund (0389932)
Michael Weinbeck (0392531)
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868
vitt.thomas@dorsey.com
bjorklund.shannon@dorsey.com
weinbeck.michael@dorsey.com

***Attorneys For Defendant-Appellant
Normark Corporation***

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of January, 2015, I caused the foregoing

document to be electronically filed with the Clerk of the Court using CM/ECF,

which will automatically send notification of such filing to counsel of record.

Dated:  January 21, 2015

Respectfully submitted,

By  s/Michael Weinbeck
J. Thomas Vitt (0183817)
Shannon L. Bjorklund (0389932)
Michael Weinbeck (0392531)
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868
vitt.thomas@dorsey.com
bjorklund.shannon@dorsey.com
weinbeck.michael@dorsey.com

***Attorneys For Defendant-Appellant
Normark Corporation***

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,711 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(c) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, size 14.


Dated:  January 21, 2015                    _s/Michael Weinbeck_____
                                                           Michael Weinbeck

# **ADDENDUM**

**Add.**

Opinion and Order for Attorney Fees and Sanctions Motions. . . . . . . . . . .    1

Supplemental Opinion and Order on Attorney Fees . . . . . . . . . . . . . . . . . .   47

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | | |
|---|---|---|
| PURE FISHING, INC., an Iowa Corporation, | ) | C.A. No. 10-cv-2140-CMC |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| | ) | ATTORNEY FEES AND |
| v. | ) | SANCTIONS MOTIONS |
| | ) | |
| NORMARK CORPORATION, a Minnesota | ) | |
| Corporation, d/b/a RAPALA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on motions of Defendant Normark Corporation ("Normark") for sanctions and attorney fees. Dkt. Nos. 351, 352, 353. For the reasons set forth below, the motions for sanctions and attorney fees relating to the claims of infringement of U.S. Patent No. 5,749,214 ("Cook Patent"), Dkt. Nos. 351 and 353, are denied. The motion for attorney fees relating to the claim of infringement of U.S. Patent No. 6,174,525 ("Kelley Patent"), Dkt. No. 352, is granted in part and denied in part.[1] Specifically, the court awards attorney fees against Plaintiff, Pure Fishing, Inc. ("Pure Fishing"), in the amount of $77,562.75, arising from Normark's defense of the Kelley Claim from November 3, 2011, through January 17, 2012, of which $17,900 is for pursuit of Normark's motion for attorney fees.

## STANDARDS

Normark relies on 35 U.S.C. § 285 ("Section 285") in pursuing attorney fees and expenses for both the Cook and Kelley Claims. Normark also relies on Rule 11 of the Federal Rules of Civil

---

[1] The original and first amended complaints asserted two claims, one of infringement of the Cook Patent and one of infringement of the Kelley Patent. Dkt. Nos. 1, 60. The second amended complaint, filed after dismissal of the claim of infringement of the Kelley Patent ("Kelley Claim"), included two claims of infringement of the Cook Patent ("Cook Claims"). Dkt. No. 200.

Procedure in pursuing sanctions and fees for the Cook Claims.  The standards applicable to both are

set out below.

## I.    SECTION 285

### A.    Three Requirements

Section 285 provides as follows:  "The court in exceptional cases may award reasonable

attorney fees to the prevailing party."  35 U.S.C. § 285.  Thus, the threshold requirement for an

award under Section 285 is that the moving party be the prevailing party.  In addition, the moving

party must establish by clear and convincing evidence that the case is "exceptional."  *E.g.,*

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012).[2]  If the first

two requirements are met, then the court exercises its discretion in deciding whether an award of

attorney fees is appropriate and, if so, how much to award.  *Highmark*, 687 F.3d at 1308.  The

requirements and applicable standards for each step are addressed in detail below.

---

[2] In a recent decision, a Federal Circuit panel indicated a favorable view of defendant's arguments that it "should not be required to prove exceptionality by clear and convincing evidence" to be eligible for attorney fees under Section 285 and a related argument that it should not be required to prove subjective bad faith to establish that the case was exceptional.  *Kilopass Tech., Inc. v. Sidense Corp.*, __ F.3d __, 2013 WL 680085, Slip. Op. No. 2013-1193 at **9-13 (Fed. Cir. Dec. 26, 2013).  The panel, nonetheless, concluded that adopting either argument would modify prior precedent, placing those determinations beyond the panel's authority.  *Id.* at **11, 13.  Based on its separate clarification of the inference that might be drawn from proof of objective baselessness, the court, nonetheless, noted that "retention of the subjective bad faith requirement may prove to have little effect on this case, as well as many that follow."  *Id.* at *11.  A concurring opinion "endorse[d]" both changes and expressed hope that the "court [would] return to its original binding precedent on fee-shifting," which provided district courts with broad discretion to award fees under Section 285.  *Id.* at *14.  Given this recent precedent and potential for *en banc* review, this court includes alternative rulings regarding certain issues addressed in this order.  *See also Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 49 (U.S. Oct. 1, 2013) (granting *certiorari* to review related issues).

2

1.    **Prevailing Party**

"Federal Circuit law defines 'prevailing party' for purposes of patent litigation." *Shum v. Intel Corp.*, 629 F.3d 1360, 1366 (Fed. Cir. 2010). Discussing the prevailing party standard under Fed. R. Civ. P. 54(d), the Federal Circuit has stated: "For the purposes of costs and fees, there can be only one winner. A court must choose one, and only one, 'prevailing party' to receive any costs award." *Shum*, 629 F.3d at 1367; *see also Highway Equip. Co, Inc. v. FECO, Ltd.*, 469 F.3d 1027, 1035 (Fed. Cir. 2006) (noting Federal Circuit treats the "prevailing party issue under Rule 54 and 35 U.S.C. § 285 similarly.").

A party is not required to prevail on all its claims to be a prevailing party but must "have received at least some relief on the merits" that "materially alter[ed] the legal relationship between the parties" resulting in a direct benefit to the party claiming prevailing party status. *Shum*, 629 F.3d at 1367-68 (addressing prevailing party requirements in context of "mixed judgment case" and finding defendant that avoided any "significant monetary liability" and obtained judgment with *res judicata* effect was the prevailing party despite plaintiff's success in obtaining judgment of co-inventorship on five of seven patents at issue). This may, for example, occur where a court dismisses an action with prejudice following and based on execution of a covenant not to sue. *Highway Equip.*, 469 F.3d at 1035 (noting "dispositive issue [was] whether the dismissal with prejudice had sufficient judicial imprimatur to constitute a 'judicially sanctioned change in the legal relationship of the parties.'").[3]

---

[3] The Federal Circuit noted in *Highway Equip.* that it had previously "held that a defendant was the prevailing party for purposes of costs under Rule 54 where the plaintiff voluntarily dismissed its case against one defendant with prejudice." *Id.* (citing *Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396 (Fed. Cir. 2004)). As the court explained, "dismissal of a claim with prejudice . . . is a judgment on the merits under the law of the Federal Circuit." *Id.* (quoting *Power Mosfet*, 378 F.3d at 1416.).

3

As explained in *Brooks Furniture Mfg., Inc. v. Dutailier Int'l., Inc.*, 393 F.3d 1376 (Fed. Cir. 2005), "[d]etermination of the prevailing party is based on the relation of the litigation result to the overall objective of the litigation, and not on a count of the number of claims and defenses" on which the party succeeded. *Brooks*, 393 F.3d at 1381 (affirming finding that plaintiff that successfully obtained declaratory judgment of non-infringement was prevailing party under Section 285, even though it was unsuccessful on or withdrew a number of its defenses, but reversing award of fees due to absence of bad faith by the opposing party).[4] Under similarly worded statutes, the Federal Circuit has defined prevailing party as one who obtained "an enforceable judgment on the merits or a court-ordered consent decree that materially altered the legal relationship between the parties, or the equivalent of either of those." *Rice Servs., Ltd. v. United States*, 405 F.3d 1017, 1025-26 (Fed. Cir. 2005) (defining term under the Equal Access to Justice Act and noting adopted approach was consistent with majority of circuits that had considered the issue). On the other end of the spectrum, the Federal Circuit has found no prevailing party where a case was terminated by voluntary dismissal without prejudice before an answer was served. *RFR Indus., Inc. v. Century Steps, Inc.*, 477 F.3d 1348 (Fed. Cir. 2007) (holding fees could not be awarded under Section 285, despite court order purporting to grant judgment on the pleadings, because plaintiff had dismissed action voluntarily before order was entered at a point when it had an absolute right to dismiss without prejudice and without court authorization).

---

[4] Lack of success on some claims is, however, "taken into account [at the final step] when determining the amount of fees [to award] under § 285." *Beckman Instr., Inc., v. LKB Produkter, A.B.*, 892 F.2d 1547, 1554 (Fed. Cir. 1989).

4

## 2.    Exceptional Case

In addition to being the prevailing party, the moving party must establish that the case is "exceptional." *Highmark*, 687 F.3d at 1308. "A case may be deemed exceptional under Section 285 when there has been 'willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions.'" *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915-16 (Fed. Cir. 2012) (quoting *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1321-22 (Fed. Cir. 2006)).[5] The Federal Circuit has also referred to the last grouping, "vexatious or unjustified litigation, conduct that violates [Rule 11], or like infractions[,]" collectively as the assertion of frivolous claims. *Highmark*, 687 F.3d at 1308. In seeking fees under Section 285, Normark relies on an argument that Pure Fishing's claims were frivolous.

To prove a case is exceptional based on frivolousness, Normark must establish by clear and convincing evidence that the case was: (1) objectively baseless and (2) brought in subjective bad faith. *Highmark*, 687 F.3d at 1308-11; *MarcTec,* 664 F.3d at 916; *see also supra* n. 2.[6] Unlike the

---

[5]    *MarcTec* and a number of other cases cited by the parties predate *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1004-06 (Fed. Cir. 2012), which modified the standard of review applied to one prong of the test for frivolousness under Section 285. *Compare Highmark*, 687 F.3d at 1309 (noting that, after *Bard*, a district court's decision as to the "objective prong" of a determination that a case is frivolous is reviewed *de novo*), *with MarcTec*, 664 F.3d at 919 (applying a clear error standard of review to both the objective and subjective prongs). To the extent this court cites to or relies on any cases predating *Bard*, it takes this change in standard into consideration.

[6]    Without referring to either prong specifically, *MarcTec* noted that, where the alleged infringer prevails, "factors relevant to determining whether a case is exceptional include the closeness of the question, pre-filing investigation and discussions with the defendant, and litigation behavior. . . . Where a patentee prolongs litigation in bad faith, an exceptional finding may be warranted." *MarcTec*, 664 F.3d at 916 (internal quotation marks and citations omitted).

5

prevailing party determination, which looks at the case as a whole, the objective and subjective determinations are made on a claim-by-claim basis. *Highmark,* 687 F.3d at 1311.

### a.   Objective Baselessness

A claim is "objectively baseless" if the allegations are such "that no reasonable litigant could reasonably expect success on the merits." *Highmark,* 687 F.3d at 1309. The objective baselessness inquiry requires an objective assessment of the merits of the claim, without consideration of subjective intent. In determining whether a claim was objectively baseless, the court undertakes "a retrospective assessment of the merits of the entire litigation," looking back at the record developed throughout the case. *Highmark,* 687 F.3d at 1310 n.1. Ultimately, "[t]he question is simply whether the record established in the proceeding supports a reasonable argument as to the facts and law." *Id.*

Because the "objective prong is a single backwards-looking inquiry into the reasonableness of the claims in light of the full record[,]" a finding of objective baselessness may be made even where a case did not appear baseless at the time filed. *Highmark,* 687 F.3d at 1310-11 (rejecting argument "objective reasonableness standard applies only with respect to the initial filing . . . and does not apply to determinating whether . . . continued litigation of baseless claims was frivolous").

Unsuccessful pursuit of a claim, even a claim defeated on summary judgment, does not warrant an automatic finding that the claim was objectively baseless. *MarcTec,* 664 F.3d at 919 (affirming award of fees under Section 285 where proposed claim constructions necessary to success on merits were not merely unsuccessful but so lacking in evidentiary support that their assertion was both objectively baseless and reflected a lack of good faith).[7] In *Highmark,* for example, the court

---

[7] As noted above, *MarcTec*'s objective baselessness determination was affirmed applying a more deferential standard of review than would now be applied. The language used in the appellate opinion, however, suggests that the district court's finding on the objective prong would be affirmed under the current *de novo* standard.

affirmed a finding that the patentee's position as to one claim was objectively baseless but reversed a finding of objective baselessness as to another claim, where the failure of both claims resulted from the district court's adverse claim construction and resulting summary judgment rulings. The Federal Circuit affirmed the finding that the first claim was objectively baseless because the patentee offered "no plausible argument" in favor of a critical claim construction at any point in the litigation. *Id.* at 1312. The court found the other claim was not objectively baseless because the patentee's claim construction position as to that claim was not foreclosed by the claim language, specification, or file history, even though those sources favored the interpretation adopted by the district court. *Id.* at 1313-14.

### b.    Subjective Bad Faith

To demonstrate subjective bad faith, the moving party must show "that lack of objective foundation for the claim 'was either known or so obvious that it should have been known' by the party asserting the claim." *Highmark*, 687 F.3d at 1309 (quoting *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (*en banc*)). In assessing the subjective prong, the court considers "the totality of circumstances." *Highmark*, 687 F.3d at 1311. However, "[u]nlike the objective prong, which is a single retrospective look at the entire litigation, the subjective prong may suggest that a case initially brought in good faith may be continued in bad faith depending on developments during discovery and otherwise." *Id.* (citing *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008)).

While a showing of specific wrongful intent will suffice to show subjective bad faith, it is not necessary. The moving party may also satisfy the subjective prong by showing recklessness or gross negligence. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990).

7

Asserting and persisting in manifestly unreasonable positions may, therefore, warrant an inference of bad faith. *Id.*; *see also MarcTec*, 664 F.3d at 918 (noting "district court made several findings supporting its conclusion that MarcTec knew its allegations were baseless but pressed them anyway").

As recently confirmed in *Kilopass Tech., Inc., v. Sidense Corp.,* Slip. Op. No. 2013-1193 (Fed. Cir. Dec. 26, 2013), the subjective prong does not require proof of actual knowledge that a claim was baseless but, instead, requires the court to consider the totality of the circumstances. *Id.* at **13-22 (reversing order denying fees under Section 285 and remanding for further consideration where district court failed to address objective prong). *Kilopass* also clarified that an inference of subjective bad faith may be founded on "[o]bjective baselessness alone . . . *unless* the circumstances as a whole show a lack of recklessness on the patentee's part." *Id.* at *22 (emphasis added); *see also supra* n.2 (discussing *Kilopass*).

### 3.    Exercise of Discretion as to Award

If a prevailing party establishes that the case is exceptional under Section 285, then the district court determines, in its discretion, whether and to what extent to award attorney fees and expenses. *Highmark*, 687 F.3d at 1309; *MarcTec*, 664 F.3d at 915. The amount to be awarded "depends on the extent to which the case is exceptional." *Highmark*, 687 F.3d at 1309. In exercising its discretion, the court should consider that Section 285 serves the remedial "purpose of compensating the prevailing party for the costs it incurred in the prosecution or defense of a case where it would be grossly unjust, based on the baselessness of the suit . . . to require it to bear its own costs." *Highmark*, 687 F.3d at 1310 n.1.[8]

---

[8] Attorney fees and costs may be awarded to a prevailing party under Section 285 even if the parties' fees and costs were paid by a third party. *See, e.g., Automated Bus. Cos., Inc. v. NEC America, Inc.*, 202 F.3d 1353, 1356 (Fed. Cir. 2000) (noting that third-party payment of fees is not

### B.    Expert Witness Fees

In addition to an award of attorney fees and expenses under Section 285, the court may award expert witness fees pursuant to its inherent powers where the court finds a party has pursued a frivolous claim in bad faith. *MarcTec*, 664 F.3d at 921 (affirming award of expert witness fees); *iLor, LLC v. Google, Inc.*, 631 F.3d 1372, 1380 (Fed. Cir. 2011) (noting expert witness fees are allowable, but reversing award where there was no basis for finding bad faith pursuit of the claim). An award of expert witness fees is not, however, automatically justified by an exceptional case finding. *MarcTec*, 664 F.3d at 921 (noting district court should "explain why an award of attorney fees under § 285 is insufficient"). Expert fees may, for example, be warranted where "vexatious conduct and bad faith increased the cost of litigation in ways that are not compensated under § 285." *Id.* at 921-22.

### II.    RULE 11

Rule 11 provides that, by presenting a pleading, motion, or other paper to the court, an attorney certifies that he or she has performed "an inquiry reasonable under the circumstances" and that (1) the claims, defenses, and other legal contentions "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law"; and (2) "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(2), (3). Under Rule 11, "presenting" includes "signing, filing, submitting, or later advocating" the position set out in a paper presented to the court. Fed. R. Civ. P. 11(b). The court may impose an appropriate sanction on any attorney,

---

relevant to the Section 285 inquiry). This is relevant to Normark's motions relating to the Cook Claims because the fees and expenses to defend this aspect of the lawsuit were paid by a third-party manufacturer, pursuant to a contractual agreement. Dkt. No. 364-7 ¶ 6 (Second Viet. Dec. re Cook Claims).

law firm, or party who violates Rule 11 or is responsible for a violation of the rule.  Fed. R. Civ. P. 11(c).

The Federal Circuit applies regional circuit law to Rule 11 motions.  *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1367 (Fed. Cir. 2012); *Antonious v. Spalding & Evenflo Cos.*, 275 F.3d 1066, 1072 (Fed. Cir. 2002).  Thus, Fourth Circuit precedent controls application of the Rule 11 standard.[9]

The Fourth Circuit applies a standard of objective reasonableness to Rule 11 motions. *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006).  A legal argument violates Rule 11(b)(2) when "in applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions to be legally justified." *Morris*, 448 F.3d at 277 (internal citations and quotation marks omitted).  Challenged legal arguments violate Rule 11 only if they have "absolutely no chance of success under the existing precedent." *Id.* Similarly, factual allegations violate Rule 11(b)(3) when they are "unsupported by *any* information obtained prior to filing." *Id.*  Thus, Rule 11's objective reasonableness standard is similar to the objectively baseless prong of the exceptional case standard under Section 285. *See Raylon*, 700 F.3d at 1370 (describing standards as similar).

While deterrence is Rule 11's primary purpose, it also serves to compensate victims and punish litigation abuses. *Brubaker v. City of Richmond*, 943 F.2d 1363, 1374 (4th Cir. 1991).  In light of these purposes, the court should  consider the following four factors in deciding the amount of any fee award under Rule 11:  (1) the reasonableness of attorney fees being sought; (2) the

---

[9] While Fourth Circuit standards apply to the Rule 11 determination itself, Federal Circuit precedent remains significant because the reasonableness of Pure Fishing's legal arguments in this patent litigation depends on their potential for success under Federal Circuit precedent.

minimum amount necessary to deter; (3) the offending party's ability to pay; and (4) factors relating to the severity of the Rule 11 violation. *Brubaker*, 943 F.2d at 1374 (citing *In re Kunstler*, 914 F.2d 505, 523 (4th Cir. 1990)).

**DISCUSSION**

## I.    PREVAILING PARTY

The court determines "prevailing party" status based on the litigation as a whole. *See, e.g.,* *Shum*, 629 F.3d at 1367 (noting there can be only one "winner" for purposes of an award of costs under Rule 54); *Brooks*, 393 F.3d at 1381 (noting prevailing party determination under Section 285 requires court to look to the "relation of the litigation result to the overall objective of the litigation," rather than the "count of the number of claims and defenses" on which each party was successful). In this case, Pure Fishing elected to pursue claims relating to two distinct patents, allegedly infringed by distinct categories of products, in a single action.[10] Normark acquiesced in the joinder of the two distinct claims by failing to seek severance until after dismissal of the Kelley Claim.[11] The court,

---

[10] As explained in the stipulation of dismissal of the Kelley Claim, the Kelley and Cook Patents are "directed to different technological arts[,]" with "the Cook Patent [being] directed to polyolefin fishing lines and methods for making such fishing lines[,]" and "the Kelley Patent [being] directed to "biodegradable recreational fishing lures." Dkt. No. 123 ¶ 2. The stipulation also explains that the accused products are "mutually exclusive categories of Normark's products," which Pure Fishing alleged "infringe the Kelley Patent and the Cook Patent, respectively." *Id.*

[11] Normark did not request any form of severance until after the Kelley Claim had been resolved by voluntary dismissal, at which point the matter had been pending for twenty-one months. Dkt. No. 1 (complaint filed August 16, 2010); Dkt. No. 137 (motion for entry of separate judgment filed May 14, 2012). This request, which was denied, came in the form of a motion for entry of separate judgment under Rule 54(b) of the Federal Rules of Civil Procedure filed concurrently with Normark's reply in support of its first motion for attorney fees relating to the Kelley Claim. Dkt. Nos. 136, 137 (arguing separate judgment was appropriate because "The Second Cause of Action is completely separate and distinct from the First Claim for Relief").

11

therefore, looks to the parties' relative success on *both* the Kelley and Cook Claims in determining whether Normark satisfies the threshold prevailing party requirement.[12]

Normark is clearly the prevailing party under this standard. As explained below, while it received some adverse rulings, Normark was entirely successful in defending against all of Pure Fishing's claims. Thus, Normark defeated the initial and primary objective of the litigation: Pure Fishing's pursuit of substantial monetary relief for infringement of the Cook and Kelley Patents. Normark was also successful in obtaining invalidity rulings with collateral benefits beyond this litigation with respect to the Cook Patent. As explained below, Normark's success in all respects was either the direct result of judicial rulings or, as conceded by the parties, the indirect result of the court's claim construction of the Kelley Patent.

**Kelley Claim.** Normark's success on the Kelley Claim was the direct result of a voluntary stipulation of dismissal with prejudice. Dkt. No. 123 (entered March 21, 2012). However, as the stipulation itself recites, dismissal was made necessary by the court's claim construction rulings. Dkt. No. 123 ¶ 7 (repeating Pure Fishing's disagreement with the court's claim construction, but conceding that "*the Claim Construction Order is a final disposition* of Pure Fishing's Second Cause of Action.") (emphasis added). Notably, the order became final only after substantial briefing on

---

[12]    Although Pure Fishing acknowledges that "Federal Circuit precedent requires courts to review the litigation as a whole in resolving awards of fees and expenses," it argues that Normark cannot recover fees for the Kelley Claim because the court never issued a ruling on the merits *of that claim*. Dkt. No. 371 at 3 n.1, 6. This argument improperly conflates the threshold prevailing party determination, which looks to the case as a whole, with the claim-by-claim analysis applied to the exceptional case determination. *Compare Brooks*, 393 F.3d at 138 (prevailing party determination looks to relation of litigation result to overall objective), *with Highmark*, 687 F.3d at 1311 (exceptional case determination is made on a claim-by-claim basis).

claim construction and related matters, oral argument, initial ruling, and full briefing on and denial of Pure Fishing's motion to reconsider.[13]

Thus, even considering the Kelley Claim in isolation, its resolution followed and resulted from substantial litigation, was prompted by judicial rulings, and was with prejudice. These factors distinguish Normark's success on the Kelley Claim from the situation presented in *RFR Indus.*, 477 F.3d 1348, where the court held that voluntary dismissal of an action without prejudice and as of right (before defendant served its answer) could not support prevailing party status.

Further, while Normark's success on the Kelley Claim, viewed in isolation, was only the *indirect* result of judicial rulings, it presents circumstances similar to those found adequate to support a finding of prevailing party status in *Highway Equip.* and *Power Mosfet*. *See supra* at 3 (discussing both cases). In *Highway Equip.*, the court held that judicial dismissal of an action with prejudice based on plaintiff's execution of a covenant not to sue was sufficient to support prevailing party status. In reaching this conclusion, the court relied on *Power Mosfet*, in which the court held that

---

[13] The disputed terms in the Kelley Patent were initially construed on November 9, 2011, after full briefing, court-requested supplemental submissions, resolution of related disputed motions, and oral argument. Dkt. Nos. 69, 73, 74, 79, 80, 83-86, 90-94. Pure Fishing promptly sought reconsideration of the construction of the Kelley Patent, arguing that the court's construction was erroneous because it introduced the ambiguous term "average" and because it relied on extrinsic evidence. Dkt. No. 97. On January 17, 2012, after full briefing, the court denied Pure Fishing's motion to reconsider noting, *inter alia*, that Pure Fishing's primary argument that inclusion of the term "average" created an ambiguity could have been but was not advanced prior to oral argument. Dkt. Nos. 115 at 3-5; *see also* Dkt. Nos. 97, 111, 113 (memoranda relating to motion). The extrinsic evidence argument was, likewise, rejected as belatedly made and non-persuasive. Dkt. No. 115 at 5-6. As the court noted, Pure Fishing had implicitly acknowledged the necessity for extrinsic evidence to aid the court in understanding "what a person of ordinary skill in the art meant when discussing the 'molecular weight' and 'degree of polymerization' of a 'long-chain polyhydroxy polymer'" by its "own listing of extrinsic evidence to be considered in construing the relevant term." Dkt. No. 115 at 6. The stipulation of dismissal of the Kelley Claim was filed two months after this ruling, on March 21, 2013. Dkt. No. 123.

13

a defendant that obtained dismissal of all claims against it through an order granting plaintiff's motion for voluntary dismissal with prejudice was the prevailing party. In so holding, the court stated that "dismissal of a claim with prejudice . . . is a judgment on the merits under the law of the Federal Circuit." *Power Mosfet*, 378 F.3d at 1396.

The only distinction between the dismissal of the Kelley Claim and the dismissal of the claims addressed in the relevant portion of *Power Mosfet* is that the dismissal in *Power Mosfet* was by order, granting plaintiff's unopposed motion for voluntary dismissal of one defendant with prejudice. Similarly, the dismissal in *Highway Equip.* was by judicial ruling based on plaintiff's voluntary execution of a covenant not to sue. Here, the dismissal was not by judicial ruling, but by joint stipulation of dismissal. The stipulation of dismissal, nonetheless, follows a judicial ruling which the stipulation itself characterizes as a "final disposition" of the Kelley Claim. Dkt. No. 123 ¶ 6 (quoted *infra* § II.A.1.).

In sum, it appears likely Normark would satisfy the prevailing party standard even if the Kelley Claim was viewed in isolation. The court need not, however, make such a determination given Normark's ultimate success on *all* claims against it and the relevant standard, which requires determination of prevailing party status based on the action as a whole.

**Cook Claims.** In connection with their cross-motions for summary judgment, the parties stipulated that Normark had literally infringed one or more claims of the Cook Patent on and before November 30, 2010, but had not done so after that period. Dkt. No. 217 (preserving Pure Fishing's right to challenge the court's denial of amendment to assert a claim for infringement under the doctrine of equivalents and Normark's right to assert affirmative defenses). Despite its admitted infringement, Normark avoided all liability as a result of its success on its affirmative defense of

14

invalidity. Dkt. No. 278 at 3 (summary judgment order invalidating the relevant claims of the Cook Patent on three grounds). The invalidity rulings provide additional relief beyond successful defense on Pure Fishing's infringement claims as Normark is now free to engage in what would otherwise have been prohibited infringing activity. *See Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1182 (Fed. Cir. 1996) ("hold[ing] that as a matter of law, a party who has a competitor's patent declared invalid meets the definition of 'prevailing party'").

**Unsuccessful Counterclaim.** To the extent Normark failed to prevail on any substantive matter, it was on its counterclaim for inequitable conduct. Normark argued that the Cook Patent was unenforceable because of intentional, material misrepresentations or omissions made during prosecution of the patent. Dkt. No. 141 at ¶¶ 32-38 (describing misrepresentations as relating to Cook's claim of inventorship, the failure to disclose sales of Fireline Fused products more than a year before the filing date of the Cook Patent, statements regarding the Hogenboom patent, and failure to disclose other material information). The factual predicate for this counterclaim overlapped with Normark's successful affirmative defense of invalidity in that both required Normark to prove material misstatements or omissions in prosecution of the patent. Dkt. No. 141 ¶ 21. While Normark established this common element, it failed to establish by clear and convincing evidence that the misrepresentations and omissions were made with specific intent to deceive the Patent and Trademark Office ("PTO"). Dkt. No. 338 at 19-36, 37-45, 51-52 (findings of fact relating to intent), 53-58 (conclusions of law relating to intent).

**Conclusion as to Prevailing Party Status**. In sum, Normark was ultimately successful in defending all claims asserted against it based on the combined result of favorable claim construction, subsequent voluntary dismissal of one claim in light of the court's claim construction (Kelley

15

Claim), and summary judgment rulings (Cook Claims). It was, therefore, wholly successful in defeating the primary objective of the litigation. *See Brooks*, 393 F.3d at 1381 (focusing on primary objective of the litigation). Normark was unsuccessful only in failing to prevail on its inequitable conduct counterclaim due to its failure to prove intent to deceive the PTO by clear and convincing evidence. Therefore, considering the totality of the litigation, the court finds that Normark is the prevailing party.

## II.    EXCEPTIONAL CASE DETERMINATION

In seeking an exceptional case determination, Normark relies solely on arguments that the Kelley and Cook Claims were frivolous. The court, therefore, considers, on a claim-by-claim basis, whether Normark has established by clear and convincing evidence that these claims were both objectively baseless and pursued in subjective bad faith.[14]

### A.    Kelley Claim

#### 1.    Background

Although ultimately resolved by voluntary dismissal with prejudice, dismissal of the Kelley Claim was admittedly made necessary by the court's claim construction ruling as reflected in the stipulation of dismissal itself, critical portions of which are quoted below.

> 5.    Claims 1 and 9 of the Kelley Patent both recite a fishing lure "comprising at least one water-soluble long-chain polyhydroxy polymer with a molecular weight of at least 195,000 and a degree of polymerization of at least 2500." The Court construed the claim term to require that the fishing lure "contain at least one component that is a water-soluble long-chain polyhydroxy polymer, and that component have an average molecular weight of at least 195,000 and an average

---

[14] While the court considers each prong separately as to the Kelley Claim and Cook Claims, it considers the two Cook Claims together. This reflects the limited distinctions between the two Cook Claims (the primary distinction being that the later-added claim was for willful infringement) and the parties' joint treatment of them in their memoranda.

degree of polymerization of at least 2500. 'Component' means an ingredient, not a single molecule within that ingredient." (Docket No. 94 at p. 1).

6.    *Pure Fishing disagrees with the Court's claim construction, but acknowledges that Normark's accused products do not infringe the Kelley Patent under the Court's claim construction.* Specifically, [Pure Fishing] admits that Normark's Trigger X products do not have at least one water-soluble long-chain polymer with a molecular weight of at least 195,000 and a degree of polymerization of at least 2500", as that claim term has been construed by the Court.

7.    *Accordingly, the Claim Construction Order is a final disposition of Pure Fishing's Second Cause of Action.* Pure Fishing and Normark hereby stipulate that Pure Fishing's Second Cause of Action is dismissed with prejudice.

Dkt. No. 123 (emphasis added).

Normark argues that Pure Fishing's underlying claim construction was objectively baseless and pursued in subjective bad faith, warranting an exceptional case finding. Most critically, Normark challenges what the court and parties have referred to as Pure Fishing's one-molecule or single-molecule theory of claim construction. Because the court's claim construction ruling, most critically its rejection of Pure Fishing's one-molecule theory, prompted the voluntary dismissal, the court summarizes the relevant claim-construction proceedings below.

**Pre-Construction Briefing.** In the Joint Claim Construction and Pre-Hearing Statement, Pure Fishing proposed the following construction of the disputed terms of Claims 1 and 9 of the Kelley Patent: "A fish lure that contains at least one component which is a water-soluble long-chain *molecule* with more than one hydroxyl group (OH) in which the sum of the molecular weights of the structural units in the *molecule* is at least 195,000." Dkt. No. 69-1 (emphasis added). The two references to "molecule" suggested Pure Fishing was arguing that the claim limitations would be met

17

if a single molecule within an accused fishing lure met the molecular weight ("MW") and related

degree of polymerization ("DOP") limitations.[15]

In its opening brief in favor of this claim construction, Pure Fishing sought to distinguish its

position from what it understood Normark's position to be, arguing as follows: "The difference

between the parties' proposed constructions is simple – whether an infringing lure must contain one

polymer with a molecular weight of at least 195,000, or whether the average molecular weight of all

polymers in the lure must be at least 195,0000." Dkt. No. 74 at 10.[16] Because this argument

referred to the "polymer" rather than a single "molecule," it left open whether Pure Fishing was, in

fact, advancing the one-molecule theory.

In Pure Fishing's response to Normark's opening claim construction brief, Pure Fishing again

sought to distinguish its proposed construction from Normark's, this time clearly disavowing the

one-molecule theory that it characterized as a straw man:

> The correct question before the Court is not whether *one molecule* in the lure must
> have the claimed properties or whether an *average of all molecules* in the lure must
> have the claimed properties. Instead, the question before the Court is whether *one
> polymer component* in the lure must have the claimed properties or whether *all
> polymers* in the lure must have the claimed properties as an average. Both of
> Normark's proposed constructions require that all polymers in the lure have the
> claimed properties as an average. In contrast, Pure Fishing's proposed constructions
> require that just one polymer component in the lure have the claimed properties.

Dkt. No. 79 at 10-11 (underlined language later retracted, *see infra* at 19 discussing Dkt. No. 91-2).

---

[15] As reflected in the stipulation of dismissal, the relevant claims of the Kelley Patent refer
to the characteristics of the polymer used in the invention, not to a single "molecule" within that
polymer. *See* Dkt. No. 123 ¶ 5 ("Claims 1 and 9 of the Kelley Patent both recite a fishing lure
'comprising at least one water-soluble long-chain polyhydroxy polymer with a molecular weight of
at least 195,000 and a degree of polymerization of at least 2500.'").

[16] The court and parties have referred to the theory Pure Fishing ascribed to Normark as the
"all-polymers theory."

In Normark's response to Pure Fishing's opening claim construction brief, Normark referred

to Pure Fishing's characterization of Normark's claim construction as a misstatement of its position:

> Instead of articulating and defending its own claim construction position, Pure Fishing mischaracterizes Normark's position. Pure Fishing claims that Normark contends that "the average molecular weight of all polymers in the lure must be at least 195,000." Dkt. 74, p. 10 (emphasis in original). Pure Fishing characterizes Normark's position on the DOP limitation similarly. Id., p. 13.
>
> Pure Fishing is wrong. Normark has never claimed that "all polymers" in the lure must be aggregated and have the stated MW and DOP. To the contrary, and as explained in its opening brief, Normark contends that the MW and DOP limitations refer to the average MW and the average DOP of the water-soluble, long-chain polyhydroxy polymer material used to make the lure. If one such ingredient, for example a polyvinyl alcohol ("PVA"), has an average MW of "at least 195,000" and an average DOP of "at least 2500", then the claim limitation is met. Hypothetically, if a lure has two different water-soluble long-chain polyhydroxy polymers, one a PVA and the other a different polymer or a different PVA, and one of those two polyhydroxy polymers has an average MW of "at least 195,000" and an average DOP of "at least 2500" but the other does not, then again the claim limitation would be met.

Dkt. No. 80 at 2-3.

Thus, at this point in the proceedings, Pure Fishing had disavowed the one-molecule theory

while Normark had disavowed the all-polymers theory. This left the court with the impression that

the parties might, in fact, be in agreement as to this aspect of claim construction. The court,

therefore, sought to confirm whether this was the case through informal, e-mail inquiry on November

2, 2011. See Dkt. No. 91-1, 91-2, 91-3 (attaching print-outs of email exchange).

Pure Fishing responded on November 3, 2011 as follows: "Pure Fishing . . . realizes that its

'disavowal' of the 'one molecule' theory is not correct. It apologizes for the confusion and

additional work it has caused. The clause 'whether one molecule in the lure must have the claimed

properties or' in Pure Fishing's reply brief should be considered deleted." Dkt. No. 91-2. Pure

Fishing then repeated its characterization of Normark's position as seeking to consider the "average MW [and DOP] of all polymers in the lure[,]" even though Normark had disavowed such a position. *Id.*

Pure Fishing also challenged inclusion of the word "average" through this response, arguing that "Normark's inclusion of the word 'average' in its proposed construction is not correct, because it ignores the essence of the invention as described by the patent." *Id.* Beyond this bald statement, which appeared to refer to the all-polymers theory Pure Fishing assumed Normark was making, Pure Fishing did not explain why use of the term "average" was inappropriate. Neither did it suggest any ambiguity regarding use of the term "average."[17]

This exchange left Pure Fishing's position unclear. In response to the court's email, Pure Fishing had retracted its disavowal of the one-molecule theory, asking the court to disregard one clause from its response to Normark's opening brief (Dkt. No. 79 at 10-11, quoted *supra* at 17-18). The language that remained suggested Pure Fishing agreed with a "one-polymer-component" theory, which is essentially the theory ultimately adopted by the court. On the other hand, Pure Fishing's proposed claim construction still included the word "molecule" and its retraction of its earlier disavowal suggested it was, again, pursuing the one molecule theory.

The court, therefore, sought clarification of Pure Fishing's position though a docket text order that posed three specific questions. Dkt. No. 84. Pure Fishing's response, which incorporated the court's questions, was as follows:

---

[17] The issue of ambiguity of the term "average" is significant because it was raised for the first time at oral argument and again on motion for reconsideration of the claim construction ruling.

> **1.** Does Plaintiff agree that molecules of a polymer component of the type covered by claims 1 and 9 would vary in length and, consequently, vary in molecular weight (MW) and degree of polymerization (DOP)?

Yes.

> **2.** Does Plaintiff maintain that a person skilled in the art WOULD understand that a reference to a polymer component with a "minimum" MW and DOP refers to a polymer component in which at least one of the molecules within the polymer component met the minimum?

Yes, Pure Fishing maintains that one skilled in the art would, upon reading this patent, which is the proper consideration here, understand that a reference to a polymer component with a "minimum" MW and DOP refers to a polymer component in which *at least one of the molecules within the polymer component* met the minimum.

> **3.** Does Plaintiff maintain that a person skilled in the art would NOT understand that a reference to a polymer component with a "minimum" MW and DOP refers to a polymer component in which the average MW and DOP of the molecules within a given sample met the minimum?

Yes, Pure Fishing maintains one skilled in the art would, upon reading this patent, not understand that a reference to a polymer component with a "minimum" MW and DOP refers to a polymer component in which the average MW and DOP of the molecules within a given sample met the minimum.

Dkt. No. 86 (emphasis added).[18]

---

[18] Through this same document, filed three business days before the scheduled November 9, 2011 claim construction hearing, Pure Fishing sought to offer a previously unnamed expert witness. *See* Dkt. No. 86 at 1-2 (November 4, 2011 response to court's inquiries asserting that Pure Fishing had "properly and timely disclosed this witness because he was identified in response to the court's post-briefing inquiries to the parties and he was "disclosed and an expert report by him is being served on Normark today.");  *see also* Dkt. No. 91 at 6 (Pure Fishing's motion to reconsider suggesting impropriety in Normark's November 4, 2011 motion to bar this expert because Normark "did not tell the Court what the subject matter of the proposed testimony was, as it did not know itself" as of that date).

The court granted Normark's motion to bar this witness given that the deadline for naming expert witnesses on claim construction expired in July 2011, and Pure Fishing did not seek to name the witness until three days before the claim construction hearing. Dkt. No. 90 at 1 (order barring witness); Dkt. No. 91-4 (November 4, 2011 email to Normark's counsel identifying the witness for the first time and suggesting that he would be made available for deposition in North Carolina on Sunday or Monday afternoon). The court denied Pure Fishing's motion to reconsider this order by oral ruling during the November 9, 2011 claim construction hearing. Dkt. Nos. 91, 92.

Pure Fishing's response to the second question confirmed that it had reclaimed the one-molecule theory. At oral argument, Pure Fishing's attorney stated:

> If you read the patent accurately and understand what Pure Fishing did here, they found a super duper ingredient. *They claim one molecule, if you will –* we originally didn't think there was any claim construction necessary and we had to come up with one because Normark had one.

> \* \* \*

> Now, the intrinsic evidence that supports this . . . [is] the description of the specification that makes very clear all you need is a little bit of this magic stuff.

> \* \* \*

> This is all about very little bits of the stuff comprising – in the abstract it says, comprises at least one water-soluble long chain polymer. Then at the bottom of column two it can be as low as one weight percent.

> . . . So in this . . . whole lure, *this magic ingredient can be as low as one weight percent. . . . The magic ingredient is very small and the percentage of super duper within the magic ingredient can be even smaller.*

> \* \* \*

> We really thought [it] couldn't be clearer that this claim calls for a little tiny bit of this ingredient. You've called it one polymer or *one molecule. I think that's a good way to look at it, and your e-mails did kind of force us to focus and get to that point.*

Dkt. No. 96 at 16-18 (transcript of Nov. 9, 2011 hearing) (emphasis added). In his concluding argument, Pure Fishing's counsel again referred to the "super duper ingredient" being "but one part of the PVA" material used to make the lure. *Id.* at 38 ( confirming that the "super duper ingredient" and PVA, of which it was a part, were "all the same polymer ingredient" and that only some of this ingredient "has to meet the claim limitations"). He also repeated that *"[a]t least could be one molecule." Id.* at 39 (referring to the claim limitation that the lure comprises "*at least one* water–soluble long-chain polyhydroxy polymer with" specified minimum MW and DOP values (emphasis added)).

22

**Claim Construction Order.** Following oral argument on November 9, 2011, the court construed the disputed claim term to require that the fishing lure "contain at least one *component* that is a water-soluble long-chain polyhydroxy polymer, and that that component have an average molecular weight of at least 195,000 and an average degree of polymerization of at least 2500. *'Component' means an ingredient, not a single molecule within that ingredient*." Dkt. No. 94 at 1 (emphasis added).

This construction rejected both the one-molecule theory and the all-polymers theory. It also reflected the unique characteristics of long-chain polymers which, unlike simple compounds, consist of molecules with varying lengths and, consequently, varying MW and DOP. *See* Dkt. No. 86 (Pure Fishing's November 3, 2011 response to docket text order agreeing that "molecules of a polymer component of the type covered by claims 1 and 9 . . . vary in length and, consequently, vary in molecular weight (MW) and degree of polymerization (DOP)"); *see also* Dkt. No. 74 at 16 (Pure Fishing's opening claim construction brief defining polymer).[19] The need to measure MW and DOP of such polymers based on some "average" of a given sample is supported not only by their unique nature (molecules of varying lengths) and an extrinsic source (expert report) submitted by Normark, but also by at least one extrinsic source on which Pure Fishing relied in its opening claim-

---

[19] As explained in Pure Fishing's opening claim construction brief:

a "polymer" is defined as a "substance made of giant molecules formed by the union of simple molecules (monomers)." McGraw-Hill Dictionary of Scientific and Technical Terms, 6th ed, 2003, pg. 1635. Each giant molecule, also known as a long-chain molecule, is formed from a chain of structural units. Each structural unit contributes to the molecular weight of the long-chain molecule. Consequently, the "molecular weight" of a long-chain molecule is "the sum of the atomic weights of all the atoms in a molecule," which is akin to "the sum of the molecular weights of the structural units in the molecule" as proposed by Pure Fishing. *Id.* at 1365.

Dkt. No. 74 at 16.

construction memorandum. *See* Dkt. No. 74 at 14 (quoting McGraw-Hill Dictionary of Scientific

and Technical Terms, 6th ed, 2003, pg. 566 ("'degree of polymerization' is defined as 'the number

of structural units in the *average* polymer molecule in a particular sample.'") (emphasis added).

**Motion to Reconsider.** After the court construed the claim, Pure Fishing retained new

counsel and then, on November 21, 2011, sought reconsideration of the claim construction order.

Pure Fishing argued that the court erred in including the term "average" in its claim construction

because the term introduced ambiguity (and a possible argument that the claim was invalid for

indefiniteness) and the court improperly relied on extrinsic evidence. Dkt. No. 97.[20]

Although Pure Fishing focused on these two issues, it acknowledged its prior pursuit of the

one-molecule theory, and ostensibly continued to advance that theory, as follows:

> At the Markman hearing on November 9, 2011, after the extensive communication
> with the Court, and extensive negotiation between the parties as to their respective
> positions, the issue of the proper construction here crystallized to that single
> issue—whether or not the word "average" should be included in the constructions of
> molecular weight and degree of polymerization. *Pure Fishing's position was, and
> is, that the disputed term requires that "at least one molecule have a molecular
> weight of at least 195,000 and a degree of polymerization of 2500."*

Dkt. No. 97 at 3 (emphasis added) (footnote omitted).[21]

Despite this reaffirmation of its reliance on the one-molecule theory, Pure Fishing did not

mention the one-molecule theory again except in a single sentence in its argument that the court

---

[20] The argument section of Pure Fishing's combined motion and memorandum includes the
following three headings: "A.  Legal Standard for Reconsideration"; "B.  An Ambiguous
Construction, Which Renders a Claim Invalid, is the Wrong Construction as a Matter of Law"; and
"C.  The Court Improperly Relied on Extrinsic Evidence[.]"

[21] This characterization of the issue at the time of oral argument as limited to the "single
issue [of] whether or not the word 'average' should be included" ignores Pure Fishing's continued
pursuit of the one-molecule theory, which is repeated in this paragraph of its motion for
reconsideration.

**Add. 24**

improperly relied on extrinsic evidence. This sentence follows a discussion of six excerpts from the Kelley Patent (discussed below) and reads as follows: "This intrinsic evidence confirms Pure Fishing's construction that '*at least one molecule* have a molecular weight of at least 195,000 and a degree of polymerization of 2500' and the word 'average' is not there." Dkt. No. 97 at 9. (emphasis added).

The first three excerpts were from claims in the Kelley Patent, each of which requires that the lure contain "**at least one** water-soluble long-chain polyhydroxy *polymer*" meeting the MW and DOP limitations. Dkt. No. 97 at 8 (bold emphasis in original, emphasis in italics added). The remaining three excerpts were from other sections of the patent (*e.g.*, summary or detailed description). These excerpts: (1) indicated the limiting polymer could be as little as 1% of the composition of the lure; (2) noted the invention's ability to "address the necessary properties required of a soft fishing lure," stated that the intended performance could be achieved using a "PVA based product" if a "significant portion of the material" meets the specified MW and DOP limitations, and explained that "the 'long-chain polymer' referred to in the claims 'refers to network and linear polyhydroxy polymers'" with the specified minimum MW and DOP; and (3) listed several types of polymer which might be used including Amorphophallus Knjac and polyvinyl alcohol ("PVA"), and stated that this material will generally make up "from about 1wt % to about 2 wt% of the total composition" of the lure. Dkt. No. 97 at 8-9.

Pure Fishing did not explain how these excerpts from the Kelley Patent "confirm[ed] Pure Fishing's construction that 'at least one molecule'" must meet the MW and DOP limitations. Certainly, none of the excerpts used the word "molecule." Instead, each referred to a "polymer" or "material." Some also referred to the polymer making up one percent or a "significant portion of

the [polymer] material." Thus, Pure Fishing's argument appeared to rest on the implicit assumptions that the phrases "at least one . . . *polymer*" and "at least one *molecule*" are equivalent and that a single molecule could make up at least one percent or a "significant portion" of the lure. Neither of these assumptions is, however, readily apparent or supported by argument or evidence.

The remainder of Pure Fishing's arguments in favor of reconsideration challenged inclusion of the word "average" in the court's construction of the MW and DOP limitations. Consistent with this focus, Pure Fishing concluded by arguing that the court should eliminate the word "average" from its construction. *Id.* at 9. Pure Fishing did not, however, suggest the addition of the word "molecule," as it had in its earlier proposed construction.

**Normark's Opposition.** Normark opposed the motion for reconsideration on both procedural and substantive grounds. Dkt. No. 111. In its procedural argument, Normark noted that Pure Fishing had either previously raised or could have raised the arguments advanced on reconsideration. *Id.* at 4 (noting Pure Fishing did argue at the hearing that "failure to specify a *particular* average raised a validity concern") (emphasis added). Substantively, Normark argued that if use of the term "average" rendered the patent ambiguous, the difficulty was in the patent itself, not the court's construction. *Id.* at 6 (noting both that Pure Fishing did not concede indefiniteness and that whether any ambiguity in the average to be used made the patent ambiguous was subject to debate); *id.* at 7 n.3 (asserting that the accused products did not infringe under any commonly-used methods for determining average MW and DOP). Normark further argued that the claim construction was correct, even if it invalidated the patent, because Pure Fishing's "single molecule construction is clearly wrong." *Id.* at 9; *id.* at 10 (noting both parties had submitted several scientific

26

texts, all of which made clear that "use of a single number for MW and DOP necessarily refers to an average, and not to a single molecule").

**Pure Fishing's Reply**.  On reply, Pure Fishing repeated its position that the court's construction of the disputed claim language "constitutes an incomplete and incorrect construction of the claims[,]" largely because the court incorporated the ambiguous term "average." Dkt. No. 113 at 1.  As to procedural issues, Pure Fishing argued that reconsideration would conserve judicial resources because the prior ruling failed to specify "which *kind* of average" should be used. However, instead of suggesting which kind of average should be used, Pure Fishing argued as follows:

> Accordingly, to resolve finally the claim construction issue and avoid further expenditure of judicial resources, the Court should grant this motion and adopt Pure Fishing's construction or construe the claims to require a sufficient quantity of the long-chain polyhydroxy polymers described in claims 1 and 9 to create the desired characteristics. Both of these constructions would require no further judicial action.

Dkt. No. 113 at 2.[22]

It is not entirely clear whether the reference to "Pure Fishing's construction" referred to Pure Fishing's originally advanced one-molecule theory or to removal of the word "average" as suggested in the conclusion to Pure Fishing's opening memorandum.  The majority of Pure Fishing's reply, however, suggested the latter (removal of the word average).  These arguments addressed (1)

---

[22] In a footnote, Pure Fishing sought alternative relief in the event of denial of its motion for reconsideration.  Specifically it asked that the court "permit the parties to engage in limited discovery and brief for the Court the issue of which method of determining the 'average' should be used to determine infringement." *Id.* at 3 n. 1.  The order denying the motion for reconsideration noted that the court's construction might "leave[] open which method of determining averages should be used." Dkt. No. 115 at 5.  It further noted, however, that it was "possible, as Normark argues, that the accused products do not meet the claim limitations regardless of which method of determining averages is used.  If so, neither the jury nor this court will need to choose between the possible methods of determining averages." *Id.* n.4.

problems caused by the claimed ambiguity in inclusion of the word "average," (2) legal principles

favoring construction to preserve validity, and (3) impropriety in the court's reliance on extrinsic

evidence in incorporating the word "average." *Id.* at 2-6. A fourth argument, which addressed an

alleged inconsistency between the court's construction and the "invention as Described and Claimed

in the Kelley Patent[,]" may refer to the one-molecule theory, or at least to an argument in favor of

some minimum number of molecules meeting the MW and DOP limitations. *Id.* at 6 (arguing that

"even a very small number of molecules meeting the thresholds in claims 1 and 9 are sufficient to

cause the desirable characteristics described in the patent.").[23]

> Pure Fishing concluded its reply as follows:
>
> The Court should reconsider its order and replace it with an order adopting Pure
> Fishing's construction or construing claims 1 and 9 of the Kelley Patent to require
> a sufficient number of the long-chain polyhydroxy *molecules* described in claim 1
> and 9 to create the *desired characteristics*. These constructions are consistent with
> the clear terms of the Kelley Patent, do not rely on extrinsic evidence, and do not
> require any further judicial action.

*Id.* at 7 (emphasis added).[24]

---

[23] It is not entirely clear what Pure Fishing is referring to as the "desirable characteristics" of the claimed invention. The claims themselves refer to biodegradability, ability to release fish attractant and "a Shore 00 durometer reading of from 0 to 50." *See* Dkt. No. 1-2 (Kelley Patent) at col. 12 lines 44-46 (claim 1) & col. 13 lines 7-9 (claim 9). These characteristics have not, however, been read out of the claims by the court's construction. There is no preamble which might import additional characteristics into the claims. The summary of the invention does, however, suggest that lures made according to the invention would be "soft and . . . exhibit superior durability, tensile strength, flexibility, elasticity, cohesive strength, aesthetic appeal, and low cost." *Id.* at col. 2 lines 15-17. To the extent Pure Fishing is relying on this description, it has not explained why these generally described characteristics should be read into the claim limitations or, more critically, why the court's construction is inconsistent with the described characteristics.

[24] Pure Fishing had not previously sought construction to require a "sufficient number" of molecules to "create the desired characteristics." As discussed above, however, it has shifted its claim construction position repeatedly, first appearing to assert, then disavowing, then reclaiming the one-molecule theory (prior to the court's initial claim construction ruling). In seeking reconsideration, Pure Fishing initially appeared to reassert the one-molecule theory, though its

**Denial of Motion for Reconsideration**. The court denied Pure Fishing's motion for reconsideration. Dkt. No. 115. As explained in the order, Pure Fishing did not raise its concern with ambiguity of the term "average" prior to oral argument. It had, instead, challenged inclusion of the term "average" in contexts that suggested its objection related to averaging the MW and DOP of *all polymers in the lure* if more than one was used. *See* Dkt. No. 115 at 4. The order also noted that some of Pure Fishing's written arguments and cited treatises submitted prior to claim construction suggested some form of average must be used to determine a polymer *component's* molecular weight and degree of polymerization. *See* Dkt. No. 115 at 4-5.

Pure Fishing's argument relating to extrinsic evidence was, likewise, deemed untimely and non-persuasive. *Id.* at 5-6. Other arguments raised for the first time in Pure Fishing's reply in support of reconsideration or, at earliest, in response to the court's pre-argument request for clarification (*e.g.*, that the court's construction was somehow inconsistent with the invention) were also rejected, as was a newly offered construction of the claim to include "a sufficient number of the long-chain polyhydroxy molecules described in claim 1 and 9 to create the desired characteristics" of the invention. Dkt. No. 115 at 6-7; Dkt. No. 113 at 7 (Pure Fishing's reply, quoted *supra*).

**Stipulation of Dismissal.** After the court denied Pure Fishing's motion for reconsideration, the parties stipulated to dismiss the Kelley Claim with prejudice. Critically, the stipulation of

---

primary argument and conclusion challenged only the inclusion of the word "average." Its reply in support of reconsideration alternatively seeks to replace the court's construction with "Pure Fishing's construction" (without specifying whether it refers to the one-molecule theory or simply removal of the word "average" from the court's construction) or a newly proposed construction "to require a *sufficient quantity* of long-chain polyhydroxy *polymers* described in claims 1 and 9 to create the desire characteristics." Dkt. No. 113 at 2. Later in its reply, Pure Fishing reintroduces the "molecule" concept, albeit in plural, seeking construction "to require a *sufficient number* of the long-chain polyhydroxy *molecules* described in claims 1 and 9 to create the desired characteristics." *Id.* at 7.

29

dismissal "acknowledg[ed] that Normark's accused products *do not infringe* the Kelley Patent *under the Court's claim construction*" and that the *"Claim Construction Order is a final disposition"* of the Kelley Claim.    Dkt. No 123 ¶¶ 6, 7 (emphasis added).[25]

**First Motion for Attorney Fees.**  Normark moved for an award of fees under Section 285 following the stipulated dismissal of the Kelley Claims. Dkt. No. 126.  After full briefing, the court determined that the issue could not properly be resolved prior to resolution of the remaining claims and, therefore, denied the motion with leave to renew "after the conclusion of proceedings as to the remaining claims." Dkt. No. 153.

**Current Motion for Attorney Fees.**  In its renewed motion for fees relating to the Kelley Claim, Normark argues that Pure Fishing's claim construction position–specifically, its "one-molecule theory"–was objectively baseless and pursued in subjective bad faith, thus warranting fees under Section 285.

**Response in Opposition to Motion for Attorney Fees.**  Pure Fishing responds that its *overall pursuit of the Kelley Claim* was subjectively and objectively reasonable because:  (1) the accused lures exhibited many of the same characteristics as lures made in accordance with the Kelley Patent; (2) pre-suit testing showed that 3% of the molecules in the accused lures had the requisite molecular weight and degree of polymerization; and (3) "it is not unusual for the lures to which the Kelley Patent is directed to be comprised of more than one grade of PVA[,]" which "confirmed that Normark was using a grade of PVA, perhaps in conjunction with a lower grade of PVA, containing

---

[25] The concession that Normark's products *do not infringe* under the court's claim construction suggests that the result would be the same regardless of the particular method of determining average MW and DOP of any polymer(s) used in the accused lures.  Thus, while inclusion of the word "average" may have presented a theoretical ambiguity, it was not an ambiguity that required resolution in this action.

30

a large number of very long chain molecules." Dkt. No. 371 at 8. Pure Fishing also included the

following argument:

> Pure Fishing is unaware to this very day of any evidence that proves for sure
> that Normark's foreign manufacturer is *not* using such a combination of grades of
> PVA, which would infringe the Kelley Patent, to make the [accused] lures. In short,
> it has never been shown that Normark, in fact, is not infringing the Kelley Patent. In
> light of the difficulty of proving Normark's overseas manufacturer used such a
> combination of grades of PVA, however, and in light of the limited sales of the
> Trigger X lures, Pure Fishing decided to voluntarily dismiss its claim. Pure Fishing
> had a good faith basis to bring this lawsuit and Normark has not and cannot show
> otherwise.

Dkt. No. 371 at 9; *see also id*. at 10 ("The use of two grades of PVA, however, renders *proving* the

use (by an overseas supplier) of a PVA 'component' meeting the claim extremely difficult.").

These arguments are notable for three reasons. First, they do not directly address the

reasonableness of the one-molecule theory of claim construction (or Pure Fishing's other

subsequently proffered alternative constructions). Second, they suggest that Pure Fishing brought

the Kelley Claim believing Normark was using two grades of PVA in the accused lures, at least one

of which met the MW and DOP limitations. Third, they suggest Pure Fishing dismissed the action

due to the difficulty of proving that Normark was using a blend of PVAs, one or more of which met

the relevant claim limitations (minimum MW and DOP).

The first point is significant because it demonstrates a continued failure to offer any plausible

support for the one-molecule theory. The second is significant because it suggests Pure Fishing was

proceeding based on the claim construction adopted by the court, rather than the one-molecule theory

(or any of its subsequently advanced alternative constructions). The third is significant for the same

reason and because of its inconsistency with the stipulation of dismissal, which acknowledged that

31

Normark *was not infringing under the court's claim construction* rather than relying on any difficulty of proof.

As to its prior objection to inclusion of the word "average" in the claim construction, Pure Fishing argues as follows:

> Pure Fishing opposed the inclusion of the word "average" in the claims because adding an "average" limitation *makes the claims inconsistent with what the inventor intended to be claimed.* Put simply, the lure claimed in the Kelley Patent is comprised generally of a larger number of very long chain PVA *molecules* than the lures that came before it.

Dkt. No. 371 at 10.

This argument is notable for several reasons. First, the challenge to inclusion of the word "average" is recast as having been based on some inconsistency with what the inventor intended rather than on ambiguity as to which form of average would be used. Second, the nature of the inconsistency between the court's construction and the inventor's intent is not specified unless it is explained by the statement that the Kelley Patent claimed lures "comprised generally of a larger number of very long chain PVA molecules than the lures that came before it." Such a construction has not been previously proposed and, in any event, would likely be impossible to apply in practice even assuming the inventor's subjective intent might provide a valid basis for claim construction.[26]

Finally, Pure Fishing relies on the complexity of the issue, as evidenced by the court's request for supplemental briefing, as evidence that its position was not objectively baseless. *Id.* ("Although the claim language may appear simple, the substantial efforts by the Court show that this was a complicated issue."). This argument mischaracterizes the source of the court's greatest

---

[26] To the extent Pure Fishing may be relying on "inconsistency" between the invention and the all-polymers theory, which it repeatedly ascribed to Normark despite Normark's disavowals of reliance on such a theory, its argument fails because the court's construction precludes reliance on such a theory.

difficulties and request for clarification, which arose not from the complexity of the issues themselves, but from Pure Fishing's shifting claim construction positions and failure to offer plausible argument in support of those positions.

### 2.     Objective Prong

Assessing the objective prong of the frivolousness determination requires the court to undertake a "retrospective assessment of the merits of the entire litigation" based on the "record established in the proceeding[,]" albeit on a claim-by-claim basis. *Highmark*, 687 F.3d at 1309. In the context of the Kelley Claim, this requires the court to focus on Pure Fishing's pre-dismissal claim-construction positions, given that the stipulation of dismissal conceded Normark's products "do not infringe . . . under the Court's claim construction" and that the "Claim Construction Order is a final disposition" of the Kelley Claim. Dkt. No. 123 ¶¶ 6, 7.

Critically, the stipulation of dismissal does not rely on *difficulty of proof* under the court's construction, as suggested in Pure Fishing's opposition to Normark's present motion. Neither does it rely on any ambiguity in the particular method of determining "average" MW and DOP of a polymer, which was the focus of Pure Fishing's pre-dismissal arguments in support of reconsideration of the court's claim construction. It, instead, concedes that Normark was not infringing under the court's construction, which rejected both Pure Fishing's one-molecule theory and the all-polymers theory Pure Fishing ascribed to Normark.

Under these circumstances, with the benefit of the full record, the court concludes that Pure Fishing's success on the Kelley Claim was dependent on its success in its proffered one-molecule theory of claim construction. The question, therefore, becomes whether a "reasonable litigant could reasonably expect success on the merits" of such an argument. *See Highmark*, 687 F.3d at 1309.

33

As summarized above, Pure Fishing's claim construction arguments initially focused on defeating what it believed to be Normark's position: that the MW and DOP values to be considered were the average of all polymers in a lure if multiple polymers were used (the all-polymers theory). While Pure Fishing included the word "molecule" twice in its proposed claim construction, it was not entirely clear from Pure Fishing's initial memorandum whether it was advancing the one-molecule theory. Indeed, in its responsive brief, Pure Fishing disavowed reliance on any such theory. Dkt. No. 79 at 10-11. Only after the court drew the parties' apparent agreement on claim construction to their attention and sought clarification did Pure Fishing unequivocally assert the one-molecule theory.

Pure Fishing did not, however, advance any plausible argument in support of construing the relevant claim language to cover any polymer that contained even a single molecule meeting the specified MW and DOP at that time (or in its earlier memoranda). Neither did it proffer such an argument on motion to reconsider, instead arguing that the court's construction was improper because it introduced an ambiguity into the construction and relied on extrinsic evidence. On reply in support of reconsideration, Pure Fishing argued the court's construction was also "inconsistent with the invention" and proffered a new alternative construction "to require a sufficient number of the long-chain polyhydroxy molecules described in claim 1 and 9 to create the desired characteristics." Pure Fishing, however, still failed to advance any plausible argument in support of the one-molecule theory. Dkt. No. 113 at 7.

Even now, Pure Fishing offers no plausible argument in favor of the one-molecule theory of claim construction. To the contrary, its current arguments suggest it (1) advanced the Kelley Claim based on a construction essentially the same as that adopted by the court (one which rejects both the

34

one-molecule and the all-polymers theories), but (2) dismissed the Kelley Claim due to difficulties of proving whether Normark was using a blend of polymer components, at least one of which met the MW and DOP limitations. The first of these arguments is inconsistent with Pure Fishing's pursuit of the one-molecule theory. The second is inconsistent with the reason stated for the dismissal in the stipulation: that Normark *was not infringing* under the court's construction.

Pure Fishing's other arguments in opposition to Normark's motion for fees relating to the Kelley Claim either suggest new alternative constructions or continued challenge to inclusion of the term "average" in the court's construction. Even if these arguments were adequately supported, and they are not for reasons explained above, they would not support the one-molecule theory on which Pure Fishing relied prior to stipulating to dismissal of the Kelley Claim with prejudice.

In sum, Pure Fishing has failed, at any point in the litigation, to proffer support for its one-molecule theory. The express language of the stipulation of dismissal of the Kelley Claim confirms that the court's claim construction, specifically the rejection of the one-molecule theory, was fatal to the Kelley Claim. It follows that there is clear and convincing evidence that Pure Fishing's pursuit of the Kelley Claim was objectively baseless in light of the full record.

### 3.    Subjective Prong

The court next considers whether the litigation was pursued in subjective bad faith. As explained in *Highmark*, subjective bad faith requires consideration of the totality of circumstances, and requires proof that the lack of an objective foundation was either known or so obvious that it should have been known. *Highmark*, 687 F.3d. at 1309. More recently, *Kilopass* clarified that a party may satisfy its burden as to this prong based on "[o]bjective baselessness alone . . . unless the circumstances as a whole show a lack of recklessness." *Kilopass*, 2013 WL 680085 *11. Unlike

the objective prong, this prong allows consideration of changing circumstances during the course of the proceeding. *Highmark*, 687 F.3d at 1390 (noting that "a case initially brought in good faith may be continued in bad faith depending on developments during discovery and otherwise.").

The court does not find subjective bad faith from the outset. Prior to the time the parties filed their claim construction memoranda, it was unclear whether Normark was relying on the all-polymers theory of claim construction (*i.e.*, that the MW and DOP limitations referred to the average of all polymers used in a lure). Only after the responsive briefs in support of claim construction were filed and the court sought clarification was it clear that Normark had disavowed the all-polymers theory, effectively confirming that it was not seeking a ruling that could avoid infringement by using a blend of polymers which, collectively, had average MW and DOP below the specified limitations. To this point, Pure Fishing's opposition to what it understood Normark's construction to be was not unreasonable. It was also only at and after this point that Pure Fishing reclaimed (or arguably clearly claimed in the first instance) the one-molecule theory.

Based on this evidence, the court finds that, prior to November 3, 2011, the totality of circumstances show that Pure Fishing was not reckless in pursuing the Kelley Claim and advancing its related claim construction (*Kilopass* standard). The court further finds that, before November 3, 2011, the evidence is insufficient to show that Pure Fishing knew or should have known that there was no objective foundation for the Kelley Claim (*Highmark* standard). The court reaches this conclusion under either a clear and convincing or preponderance of the evidence standard.

No later than November 3, 2011, however, it should have been obvious to Pure Fishing not only that it *was* relying on the one-molecule theory of claim construction, but also that its success on the merits of the Kelley Claim was dependent on this construction. This is evidenced both by

36

Pure Fishing's express statements in its pre-hearing responses to the court's requests for clarification and through oral argument. It is confirmed by Pure Fishing's subsequent concession in the stipulation of dismissal that Normark *was not infringing* under the court's construction. Given what Pure Fishing would have understood at this time regarding Normark's position, and its failure, even now, to proffer a plausible argument in support of the one-molecule theory, the court finds, by clear and convincing evidence, that Pure Fishing's pursuit of the Kelley Claim was in subjective bad faith from November 3, 2011, when it reclaimed the one-molecule theory though its email response, through January 17, 2011, when the court denied Pure Fishing's motion for reconsideration, which continued to advance the one-molecule theory (and other alternative theories for which no plausible support has been proffered). Dkt. Nos. 86, 115.[27]

### 4.    Award of Fees.

Normark seeks the following fees and expenses relating to the Kelley Claim: (1) $281,160.63 in attorney fees and expenses for defense of the merits; (2) $24,371 for expert fees; (3) $62,408.57 for attorney fees and expenses in bringing its first motion for attorney fees; and (4) $2,913.50 for bringing its renewed motion for attorney fees. For the reasons set forth below, the court awards Normark a total of $77,562.75 in fees relating to the Kelley Claim. The court declines to award expert witness fees or other expenses.[28]

**Attorney Fees.** Because the court has found Pure Fishing's pursuit of the Kelley Claim subjectively baseless only for a limited period of time, it limits its award of attorney fees for defense

---

[27] This finding, based on clear and convincing evidence, necessarily includes a finding that the same standard would be met under a lower, preponderance of the evidence, standard.

[28] The parties have, by stipulation, agreed to costs to be paid under Rule 54. This order addresses only expenses beyond those allowable under Rule 54.

of the merits to the same period: November 3, 2011, through January 17, 2012. Normark's attorney

fees during this period total $59,662.75. The court awards these fees for Normark's defense of the

merits.[29]

Because the court has not awarded the full attorney fees sought for defense of the merits, it

declines to award the full amount sought for pursuit of Normark's two motions for attorney fees and

expenses. Balancing the degree of Normark's ultimate success in obtaining attorney fees and the

work which would have been necessary had Normark pursued only one motion limited to the fees

ultimately awarded, the court finds that an award of roughly 30% of the award of attorney fees for

defense of the merits is appropriate. The court, therefore, awards $17,900 in attorney fees for

Normark's pursuit of its related motions for attorney fees.

**Expenses.** The court declines to award any expenses for either defense of the merits or

pursuit of the fee award under Section 285 because it does not find an award of this additional,

relatively small, amount necessary to adequately compensate Normark for its defense of the Kelley

Claim and pursuit of its related motions for fees. To the extent any expenses might otherwise be

justified, they are adequately offset by the court's award of 30% in attorney fees for pursuit of the

fee motions. Given this award of fees, the court does not find it would be "grossly unjust" for

Normark to bear these expenses in light of the fee award allowed above. *See Highmark*, 687 F.3d

at 1310 n.1.

**Expert Fees.** The court declines to award any part of the $24,371 in expert fees Normark

incurred in defending the Kelley Claim. Most of Normark's expert fees were necessarily incurred

before November 3, 2011, given that Normark filed Professor Siegel's expert report and a related

---

[29] While Pure Fishing challenges the propriety of awarding any fees, it does not challenge
the rates sought, hours invested, or other factors relevant to the amount of the fees to be awarded.

affidavit in support of its claim construction in August 2011. Dkt. No. 73-15, 73-16.[30] Thus, most

were incurred during a period for which the court has found no subjective bad faith.[31] The court

further finds the award of fees above sufficient to adequately compensate Normark for its defense

of the Kelley Claim for the period that claim was pursued in subjective bad faith. *See MarcTec*, 664

F.3d at 921-22 (noting court has inherent power to award expert fees where "vexatious conduct and

bad faith increased the cost of litigation in ways that are not compensated under § 285" but should

"explain why an award of attorney fees under § 285 is insufficient").

    **B.**    **Cook Claims**

    **1.**    **Background**

    **Claim Construction.**    Litigation as to the Cook Claims included some dispute as to claim

construction, which the court was able to resolve by written order without oral argument. Dkt. No.

83 (claim construction order entered October 26, 2011). The most critical issue was the extent to

which use of the term "about" modified two phrases, one setting a temperature range and one setting

a draw ratio. The court rejected both parties' proffered interpretations of "about" as it related to the

temperature range. *See* Dkt. No. 83 at 4-6 (finding neither party's construction persuasive and

evidence insufficient to clarify the meaning of "about" beyond "approximately"). The court adopted

---

    [30] The fees sought are for Professor Siegel's expert work and report, for testing by Jordi Laboratory, and for services provided by Dr. Germani. Normark asserts that Professor Siegel relied on the other two sources in forming his opinions. It follows that the services provided by the other two sources predated Professor Siegel's submission of his written opinion.

    [31] Professor Siegel was apparently deposed on November 3, 2011. While this is just within the period for which the court has found subjective bad faith and awarded attorney fees under Section 285, the court does not find sufficient justification for exercise of its inherent power to award expert witness fees for deposition attendance on this date.

Pure Fishing's interpretation of "about" as it related to the draw ratios. *Id.* at 6-7.   Neither party

sought reconsideration of this order.

**Discovery and Amendment of Complaint.**  The matter proceeded through discovery, with

judicial intervention being required only as to a few discovery disputes and a motion to amend the

complaint.  The motion to amend the complaint was granted to the extent it sought to add a claim

for willful infringement but denied to the extent it sought to add a claim under the doctrine of

equivalents. Dkt. Nos. 155 (June 8, 2013 motion to amend), 195 (July 26, 2012 order granting in

part).  Pure Fishing sought reconsideration of the partial denial of its motion. Dkt. No. 208.  That

motion was also denied.  Dkt. No. 262 (order entered September 12, 2012).

A motion to compel discovery (also filed by Pure Fishing) was, similarly, granted in part and

denied in part.  Dkt. Nos. 179 (motion to compel), 224 (August 15, 2013 order granting in part).

Other discovery disputes were resolved by teleconference without formal motion.

**Cross-Motions for Summary Judgment.**  On August 6, 2012, the parties filed cross-

motions for summary judgment and other related motions.  Dkt. Nos. 201-07.[32]   Critical for

purposes of this order, Pure Fishing sought summary judgment on its claim of literal infringement

and on Normark's affirmative defenses and counterclaim.  Normark, in turn, sought summary

judgment on its affirmative defense of invalidity and on the claim of willful infringement.

Normark's motion was dependent, in large measure, on the deposition of the claimed inventor,

Roger Cook ("Cook") who was deposed on April 11, 2012. *See, e.g.*, Dkt. No. 201-29.

**Stipulation of Infringement.**  On August 8, 2012, two days after filing their cross-motions

for summary judgment, the parties filed a stipulation regarding infringement issues. Dkt. No. 217.

---

[32]  The record contains both redacted and unredacted versions of many of these documents.

40

Specifically, the parties stipulated that, for a specified period (June 2008 through June 9, 2010), certain of Normark's fishing lines were made using a process which literally infringed the Cook Patent. *Id.* ¶¶ 6-8. The parties further stipulated that the processes used for the two previously infringing product lines were changed on May 31, 2010 and June 9, 2010, so that products made after those dates did not literally infringe the Cook Patent. *Id* ¶¶ 9-10.

Allowing for the sales cycle, the parties stipulated that Normark's accused products sold before November 30, 2010 literally infringed the Cook Patent but those sold after that date did not. *Id.* ¶ 11. They further stipulated that, unless the doctrine of equivalents was allowed on reconsideration of the motion to amend, Normark's products sold after November 30, 2010 did not infringe the Cook Patent. *Id.* ¶ 12.

Normark reserved its right to challenge Pure Fishing's claims of infringement on other grounds. *Id.* ¶ 14. Pure Fishing reserved its right to pursue its motion to reconsider denial of its motion to amend to the extent it sought to add a claim under the doctrine of equivalents and a related right to appeal. *Id.* ¶ 13.[33]

Roughly two weeks later, on August 21, 2012, the parties filed a second stipulation addressing the effect of the earlier stipulation on their cross-motions for summary judgment. Dkt. No. 226. Specifically, they agreed that the prior stipulation resolved portions of both parties' cross-motions for summary judgment (Pure Fishing's pursuit of partial summary judgment that Normark had literally infringed the Cook Patent, and Normark's corresponding motion for summary judgment that it had not). *Id.*

---

[33] As noted above, the motion to reconsider was, ultimately, denied.

**Summary Judgment Ruling.** The court issued an oral ruling on the cross-motions for summary judgment on October 5, 2012, directing Normark to prepare a proposed order and addressing procedures for comment on the proposed order. Dkt. No. 273. The court entered its written order on December 11, 2012. Dkt. No. 278. Critical for purposes of this order were the following findings:

> The court finds that claims 1, 4, and 5 of the '214 patent are invalid as a matter of law for three reasons. First, the asserted claims are invalid under 35 U.S.C. § 102(f), because Roger Cook is not the inventor of the asserted claims. Second, the asserted claims are invalid under 35 U.S.C. § 102(b), because [Pure Fishing] used the claimed process to make the 1995 Fireline Fused products more than one year before it filed the application that led to the '214 patent. Third, the asserted claims are also invalid as obvious under 35 U.S.C. § 103.

Dkt. No. 278 at 3; *id.* at 26-31 (addressing invalidity for lack of inventorship); *id.* at 31-36 (addressing invalidity due to prior sales of 1995 Fireline Fused products).

These rulings resulted in dismissal of all claims asserted by Pure Fishing despite the earlier stipulation that Normark had literally infringed for a specified period of time. Only Normark's counterclaim for inequitable conduct proceeded to trial.

**Inequitable Conduct Counterclaim.** Trial on the inequitable conduct counterclaim was scheduled for April 15-16, 2013. Dkt. Nos. 306, 307. During the first day of trial, the court reviewed certain documents *in camera*, and ordered that some of them be produced. Due to this late production, trial was continued to May 14-15, 2013. Dkt. Nos. 307, 322, 323. Both parties submitted post-trial proposed findings and conclusions and related responses in July 2013. Dkt. Nos. 332, 333, 335, 336.

The court issued its findings and conclusions on August 14, 2013. Although the court found various material misrepresentations or omissions were made to the PTO, it did not find clear and

42

convincing evidence of intent to deceive. The court, therefore, found for Pure Fishing on Normark's

counterclaim for inequitable conduct. Dkt. No. 338.

### 2.    Objective Prong

Normark argues that Pure Fishing's pursuit of the Cook Claims was objectively unreasonable

for two reasons. First, Normark argues that Pure Fishing "never had any legitimate basis for this

claim" because the sole claimed inventor, Roger Cook, testified in his deposition that the "claimed

invention was 'not his idea,' but instead was based on recommendations made by [Pure Fishing's]

supplier," and this testimony was confirmed by Pure Fishing's own documents. Dkt. No. 364 at 1.

Second, Normark argues that overlaps between the process claimed in the Cook Patent and the

Fireline Fused products, which were on sale more than a year before Cook filed the application that

matured into the Cook Patent, precluded any reasonable argument that the on-sale bar did not apply.

Both arguments are founded on Normark's success on its invalidity defense.

While the court ultimately ruled in Normark's favor on this invalidity defense, finding the

Cook Patent invalid on both grounds, it does not find Pure Fishing's opposition to Normark's

position as to either ground for invalidating the patent to be "such that no reasonable litigant could

reasonably expect success on the merits." *Highmark*, 687 F.3d at 1309. It is of some significance

here that the critical arguments related to an affirmative defense, and not to the underlying claims

of infringement on which Pure Fishing was at least partially successful as a result of the stipulation

of infringement. Moreover, this affirmative defense required proof by clear and convincing

evidence. *E.g.*, *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993).

**On-Sale Bar.** Evaluation of the on-sale bar defense required both interpretation of the scope

of the Cook Patent and a determination of the extent, if any, of its overlap with the process used to

make Fireline Fused products during the relevant period. While the court ultimately rejected Pure Fishing's arguments regarding the overlap, it does not find them so unreasonable as to satisfy the standard for objective unreasonableness.

For example, Pure Fishing's argument that the Cook Patent did not overlap with Fireline Fused was based, in part, on intrinsic evidence relating to the resulting line's opaque white color, which it argued a person skilled in the art would realize meant no fusing had occurred. *See* Dkt. No. 244 at 24 (memorandum in opposition to summary judgment). Pure Fishing also relied on intrinsic evidence referring to a "total" draw ratio, which it argued distinguished the Cook Patent from the Fireline Fused's multistage drawing. *Id.* at 20-23. *See also* Dkt. No. 338 at 2 n.2 (Findings and Conclusions on Inequitable Conduct noting invalidity determination turned, in part, on the overbreadth of the claims). These arguments in reliance on intrinsic evidence, while ultimately unsuccessful, were not so unreasonable that no reasonable litigant could reasonably expect them to succeed on the merits in light of Normark's burden of proving invalidity by clear and convincing evidence.

**Inventorship.** While a closer question, the court reaches the same conclusion as to Cook's claim of inventorship. Certainly, in light of Cook's statements in his deposition, Pure Fishing had an uphill battle to overcome the invalidity defense based on lack of inventorship.[34] However, given the applicable standard of proof, Pure Fishing's argument that the input and assistance received from third-parties did not defeat Cook's claim of inventorship was not so unreasonable as to be one

---

[34] Certain evidence from the files of the attorney who prosecuted the application for the Cook Patent was not obtained by Pure Fishing until shortly before or during the inequitable conduct trial. Some of this evidence provided additional support for findings that Cook was not the inventor of the full scope of what was claimed in the Cook Patent. *E.g.*, Dkt. No. 338 at 23 n.12, ¶¶ 44, 45; *id.* at 26-28 ¶¶ 50, 53, 54.

on which no reasonable litigant could expect to succeed. *See* Dkt. No. 244 at 17-18. Pure Fishing's

arguments based on Cook's possibly flawed recollection (nearly twenty years after the patent issued)

and limited understanding of patent law, as well as Foote's possibly contradictory testimony were,

likewise, not so unreasonable that they satisfied this standard. *Id.* at 18-19. Therefore, given the

applicable standard of proof, the court does not find Pure Fishing's opposition to this aspect of

Normark's invalidity defense to have been objectively baseless in light of the full record.

In sum, considering the full record as developed through the conclusion of this matter in

light of the standard of proof applicable to the invalidity defense, the court finds that Normark has

failed to show, by clear and convincing evidence, that Pure Fishing's pursuit of the Cook Claims

was objectively baseless.[35]

### 2.    Subjective Prong

Because the court finds the objective prong is not satisfied, it need not address the subjective

prong. Were the court to reach the subjective prong, it would find it not satisfied for many of the

same reasons addressed above as to the objective prong. The primary difference is that the court

would consider the state of the record *at the time the court granted summary judgment*. This would

preclude consideration of evidence that was not available to Pure Fishing's counsel until after the

summary judgment order was entered.[36] Thus, even if this court found Pure Fishing's arguments

in opposition to Normark's invalidity defense to be objectively baseless, it would not find them so

---

[35] The court also finds, in the alternative, that Normark failed to meet this burden under a preponderance of the evidence standard. While this finding presumes an alternative burden of proof as to the motion for fees, it recognizes that Normark's ultimate success (after stipulating to a period of infringement) required it to establish invalidity by clear and convincing evidence.

[36] The court does not consider here documents that were not available to Pure Fishing or its counsel prior to summary judgment. *See supra* n.34.

clearly baseless as to support a finding of subjective bad faith, particularly in light of the requirement that such a defense be proven by clear and convincing evidence.

## III.    RULE 11

For the same reasons addressed above with respect to the objective prong of the frivolousness determination, the court does not find Rule 11 sanctions warranted as to the Cook Claims. That is, the court does not find that "a reasonable attorney in like circumstances could not have believed his [arguments in opposition to the invalidity defense] to be legally justified." *Morris*, 448 F.3d at 277.

### CONCLUSION

For the reasons set forth above, the court grants in part and denies in part Normark's motion for an award of attorney fees under Section 285 as to the Kelley Claim (Dkt. No. 352), awarding a total of $77,562.75. The court denies the motions for sanctions under Rule 11 and for attorney fees under Section 285 as to the Cook Claims. Dkt. Nos. 351, 353.[37]

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
January 21, 2014

---

[37] As noted above, the parties have resolved their cross-petitions for costs under Fed. R. Civ. P. 54 by stipulation.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| PURE FISHING, INC., an Iowa Corporation, | ) | C.A. No. 10-cv-2140-CMC |
| | ) | |
| Plaintiff, | ) | SUPPLEMENTAL |
| | ) | OPINION AND ORDER |
| v. | ) | ON ATTORNEY FEES |
| | ) | |
| NORMARK CORPORATION, a Minnesota | ) | |
| Corporation, d/b/a RAPALA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on remand from the United States Court of Appeals for the Federal Circuit for reconsideration of certain aspects of this court's January 21, 2014 order granting a partial award of attorneys' fees to Defendant Normark Corporation ("Normark"). *See* ECF No. 392 (Federal Circuit's remand order); ECF No. 375 ("Opinion and Order [on] Attorney Fees and Sanctions Motions" entered January 21, 2014). Specifically, the Federal Circuit remanded to allow this court "to reconsider its order on attorneys' fees under 35 U.S.C. § 285 in light of the United States Supreme Court's recent decisions in *Highmark Inc. v. Allcare Health Management Systems, Inc.*, 134 S. Ct. 1744 (2014) and *Octane Fitness, LLC, v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014)." ECF No. 392.

Having fully considered Normark's post-remand motion and the parties' related memoranda in light of the change in the applicable standard, the court modifies its prior order to award Normark an additional $ 283,127.09 in fees and expenses for defense of the claim relating to U.S. Patent No. 6,174,525 ("Kelley Patent"). The court declines to award additional fees for defense of claims (or

pursuit of counterclaims) relating to U.S. Patent No. 5,749,214 ("Cook Patent"). The court also declines to award fees for pursuit of the present motion.[1]

## MODIFIED STANDARD

This court's prior order on attorneys' fees (ECF No. 375) addressed Normark's motion for fees and expenses under 35 U.S.C. § 285 ("Section 285") as well as for sanctions under Rule 11 of the Federal Rules of Civil Procedure and expert expenses under the court's inherent authority. Consistent with the scope and basis of the remand, this order modifies and supplements the prior order only as to Normark's motion for fees and (non-expert) expenses under Section 285.

The text of Section 285 reads as follows: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Thus, the plain language of Section 285 imposes two requirements before the court *may* award fees, that the case be "exceptional" and that the party seeking fees be the "prevailing party."

Prior to the decisions in *Octane Fitness* and *Highmark*, the Federal Circuit interpreted the "exceptional case" requirement as setting a high threshold for an award of fees. *See Brooks Furniture Mfg., Inc. v. Dutailier Int'l., Inc.*, 393 F.3d 1376, 1381 (Fed. Cir. 2005) ((holding case may be deemed exceptional under Section 285 "when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." ); *see also MarcTec, LLC v.*

---

[1]    This court previously awarded attorneys' fees in the amount of $77,562.75 against Plaintiff, Pure Fishing, Inc. ("Pure Fishing"), arising from Normark's defense of Pure Fishing's claim relating to the Kelley Patent ("Kelley Claim"), of which $17,900 was for Normark's pursuit of its motion for attorneys' fees. The amounts awarded by this order are in addition to the fees previously awarded and costs paid by agreement.

*Johnson & Johnson*, 664 F.3d 907, 915-16 (Fed. Cir. 2012)(applying *Brooks*); *Highmark*, 687 F.3d

1300, 1308 (Fed. Cir.) (referring to the last grouping, "vexatious or unjustified litigation, conduct

that violates [Rule 11], or like infractions[,]" collectively as the assertion of frivolous claims),

*vacated and remanded* 134 S. Ct. 1744 (2014). In its prior motion, Normark argued that fees should

be awarded under Section 285 on the last basis, frivolousness. Under then-controlling law, this

required Normark to establish by clear and convincing evidence that the case was: (1) objectively

baseless *and* (2) brought in subjective bad faith. *Highmark*, 687 F.3d at 1308-11; *MarcTec,* 664 F.3d

at 916. *See* ECF No. 375 at 2-8 (addressing prior standard).

The United States Supreme Court's decisions in *Octane Fitness* and *Highmark* modified the

Federal Circuit's standard for an attorneys' fees award. As the Court explained in *Octane Fitness*:

> [A]n "exceptional" case is simply one that stands out from others with respect to the
> substantive strength of the party's litigating position (considering both the governing
> law and the facts of the case) or the unreasonable manner in which the case was
> litigated. District courts may determine whether a case is "exceptional" in the case-
> by-case exercise of their discretion considering the totality of the circumstance. . . .
> [T]here is no precise rule or formula for making these determinations, but instead
> equitable discretion should be exercised in light of the considerations we have
> identified.

*Octane Fitness*, 134 S. Ct. 1756 (internal quotation marks omitted); *id.* n. 6 (noting nonexclusive list

of factors considered "under a similar provision in the Copyright Act" included "frivolousness,

motivation, objective unreasonableness (both in the factual and legal components of the case) and

the need in particular circumstances to advance considerations of compensation and deterrence.").

Specifically as to frivolousness, the Court rejected the Federal Circuit's former requirement

that a case be *both* "objectively baseless *and* that the plaintiff brought it in subjective bad faith." *Id.*

at 1757 (emphasis in original). Instead, the court held that "a case presenting *either* subjective bad

faith *or* exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* (emphasis added).

Finally, the Court modified the burden of proof to one of preponderance. *Id.* at 1758. The court explained that "Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one." *Id.* (also noting "patent-infringement litigation has always been governed by a preponderance of the evidence standard"). The Court again emphasized the discretionary nature of the decision in *Highmark*, which relied on the reasoning in *Octane Fitness* to hold "that an appellate court should review all aspects of a district court's § 285 determination for abuse of discretion." *Id.*

### DISCUSSION

**I.    Prior Alternative Rulings**

As Pure Fishing notes in its memorandum in opposition to Normark's renewed motion for fees, this court made various alternative rulings in its prior order. For example, the court addressed critical determinations under both the then-controlling clear and convincing evidence standard of proof and a potential preponderance of the evidence standard. While these alternative rulings may have anticipated the change in the burden of proof, they did not anticipate the significant change in what the party seeking fees must prove. Thus, the alternative rulings in this court's prior order do not foreclose the modified rulings Normark now seeks.

**II.    Prevailing Party**

Neither party suggests that the standards the court relied on in determining that Normark is a prevailing party entitled to seek fees under Section 285 were modified by *Octane* or *Highmark*.

4

The court, therefore, incorporates its prior ruling on this point.  ECF No. 375 at 11-16.  As

summarized in the prior order:

> **Conclusion as to Prevailing Party Status**.  In sum, Normark was ultimately
> successful in defending all claims asserted against it based on the combined result of
> favorable claim construction, subsequent voluntary dismissal of one claim in light of
> the court's claim construction (Kelley Claim), and summary judgment rulings (Cook
> Claims).  It was, therefore, wholly successful in defeating the primary objective of
> the litigation.  *See Brooks*, 393 F.3d at 1381 (focusing on primary objective of the
> litigation).  Normark was unsuccessful only in failing to prevail on its inequitable
> conduct counterclaim due to its failure to prove intent to deceive the PTO by clear
> and convincing evidence.  Therefore, considering the totality of the litigation, the
> court finds that Normark is the prevailing party.

## III.    Kelley Claim

As to the Kelley Claim, this court previously held, under a clear and convincing standard of

proof and in light of the full record, that Pure Fishing's position was objectively baseless.[2]  ECF No.

375 at 33-35.  The court noted, in particular, Pure Fishing's shifting positions as to claim

construction and the ultimate dependence of the claim on Pure Fishing's "one-molecule theory of

claim construction."  *Id*.  As the prior order on attorneys' fees explained:

> In sum, Pure Fishing has failed, at any point in the litigation, to proffer support for
> its one-molecule theory.  The express language of the stipulation of dismissal of the
> Kelley Claim confirms that the court's claim construction, specifically the rejection
> of the one-molecule theory, was fatal to the Kelley Claim.  It follows that there is
> clear and convincing evidence that Pure Fishing's pursuit of the Kelley Claim was
> objectively baseless in light of the full record.

*Id*. at 35.

---

[2] The court incorporates its prior summary of proceedings relevant to the Kelley Claim.  ECF
No. 375 at 16-33.  The court also incorporates its prior discussion of the objective prong of the
former *Brooks* test.  *Id*. at 33-35.  For reasons explained below, the court modifies its prior
discussion as to the subjective prong.  *Id*. at 35-38.

5

The court, nonetheless, limited its award of fees to a period between November 3, 2011 and January 17, 2012, because it found clear and convincing evidence of Normark's *subjective* bad faith only during this period. The court based this determination, in part, on potential confusion as to the position Normark was taking. As the prior order explained:

> Prior to the time the parties filed their claim construction memoranda, it was unclear whether Normark was relying on an all-polymers theory of claim construction . . . . Only after the responsive briefs . . . were filed and the court sought clarification was it clear that Normark had disavowed the all-polymers theory . . . . To this point, Pure Fishing's opposition to what it understood Normark's construction to be was not unreasonable.

ECF No. 375 at 36.

Pure Fishing relies primarily on this language and its ultimate voluntary dismissal of the Kelley Claim in arguing that the court should not award any additional fees when considering Normark's renewed motion for fees under the *Octane Fitness* standard. ECF No. 395 at 21 (quoting ECF No. 375 at 36). Pure Fishing also notes that the court applied two alternative tests and standards of proof, finding that, prior to November 3, 2011, "Pure Fishing was not reckless in pursuing the Kelley Claim and advancing its related claim construction (*Kilopass* standard)" and that the evidence for the same period did not establish that Pure Fishing "knew or should have known that there was no objective foundation for the Kelley Claim (*Highmark* standard)." ECF No. 395 at 21-22 (quoting ECF No. 376 at 36).

For reasons explained below, were the court to now reconsider this ruling under the *Brooks* standard, it would be inclined to find that Pure Fishing was reckless in its pursuit of the Kelley Claim and that Pure Fishing should have known from very early in the litigation, if not before it was even filed, that the Kelley Claim lacked an objective foundation. However, as such a ruling is beyond the

scope of remand, the court rests only on a determination under *Octane Fitness* that Pure Fishing's

pursuit of the Kelley Claim "stands out with respect to its substantive strength" and "unreasonable

manner of litigation" and these conclusions apply throughout the litigation of the Kelley Claim.

As noted above and in prior orders, Normark's initial brief on claim construction might be

read to advance an all-polymers theory of claim construction. It was primarily because of this

potential interpretation of Normark's position that the court previously declined to find Pure Fishing

acted with subjective bad faith in opposing Normark's claim construction position before November

3, 2011. The court may, in this respect, have focused too narrowly on the reasonableness of Pure

Fishing's opposition to Normark's proposed claim construction as opposed to the ultimate viability

of *Pure Fishing's proposed claim construction and viability of the underlying claim.* As noted in

the prior order, once the court rejected Pure Fishing's proposed one-molecule theory (and alternative

constructions offered on motion for reconsideration), Pure Fishing conceded it could not succeed on

the Kelley Claim. This suggests not only that Pure Fishing's claim construction (for which no

reasonable support was ever offered) was objectively baseless, but also that Pure Fishing should have

understood from the outset that the Kelley Claim was dependent on this claim construction. This

conclusion is further supported by Normark's unchallenged assertion that, before the complaint was

served, it voluntarily disclosed the polymers it was using, none of which would support a claim of

infringement even when (properly) considered independently.

Having reviewed the proceedings relevant to the Kelley Claim, this court reaffirms its

conclusion that Pure Fishing's pursuit of the Kelley Claim was objectively baseless in light of the

full record because Pure Fishing never articulated any reasonable basis for the claim construction

on which the Kelley Claim was necessarily dependent. This finding further establishes that the case

stands out (as exceptionally weak) with respect to its substantive strength, thus supporting an award of fees under *Octane Fitness*.

Though subjective bad faith is no longer required to support an award of fees, the court has also considered whether and at what point Pure Fishing should have recognized that the Kelley Claim was, if not fatally flawed, at least exceptionally weak. As to this issue, the court finds that Pure Fishing should have recognized the extreme weakness of the Kelley Claim prior to the date Normark filed its answer. Together, these considerations strongly favor an award of fees.

While the court does not repeat them here, it also incorporates its summary of Pure Fishing's shifting positions relevant to the Kelley Claim. *Id.* at 33-34. The court finds that these shifting positions resulted in an unwarranted increase in the expense of litigation imposed on Normark and burden imposed on the court and support a finding that Pure Fishing litigated the Kelley Claim in an unreasonable manner. The exceptional weakness of the Kelley Claim combined with the unreasonable manner of its pursuit also suggest the need for compensation and deterrence.

Taking all of these factors into consideration, the court finds that a further award of fees for Normark's defense of the Kelley Claim is warranted.[3] The court, nonetheless, retains discretion as to the amount of the award.

As demonstrated by the Sixth Declaration of J. Thomas Vitt, Normark's fees and expenses incurred in defense of the Kelley Claim totaled $305,531.63 as of September 2013. In addition, Normark incurred fees of $79,529.21 in its first two motions for attorneys' fees relating to the Kelley

---

[3] The prior order limited the fee award because the court found subjective bad faith only for a limited period. As explained in *Octane*, however, fees may be awarded *either* for objective baselessness *or* subjective bad faith. Here, the court finds that the objective baselessness of the Kelley Claim, together with other considerations addressed above, is sufficient to support an award of fees without limitation to a specific period.

Claim. Accounting for the prior fee award of $77,562.75, which has been paid, and expert witness fees, which Normark concedes are not available under Section 285, Normark now seeks an additional award of $283,127.09 for fees incurred before this court's prior order on fees and an additional $4,022, which represents one half of the legal fees and expenses incurred to prepare the present motion for fees. Thus, Normark seeks a total additional award of $287,149.09.

Pure Fishing does not present any specific argument as to why the court should award less than this amount if it does award additional fees. Its only relevant argument consists of its concluding sentence: "Alternatively, if the Court does determine that the case, or any additional portion thereof, is exceptional, the Court should exercise its discretion and deny Normark *any* additional attorneys' fees." ECF No. 395 at 25.

Having considered the degree to which the Kelley Claim was exceptional, specifically the objective baselessness (and thus exceptional weakness) of the claim, the degree to which it was pursued in an unreasonable manner, and the need for compensation and deterrence, the court finds an additional award of fees and expenses in the amount of $283,127.09 is appropriate.[4]

## IV.    Cook Claims

With respect to the Cook Claims, the court previously found neither objective baselessness nor subjective bad faith and, consequently, denied Normark's motion for attorneys' fees.[5] The court

---

[4] As Normark notes, the issue of expert witness fees is not before the court on remand. The court notes, nonetheless, that it would not modify its prior decision and award expert witness fees under the court's inherent authority were that issue properly before it.

[5] The court incorporates its prior summary of proceedings relevant to the Cook Claims. ECF No. 375 at 39-43. The court also incorporates its discussion of the objective and subjective prongs under the *Brooks* standard, which, though not determinative, address considerations relevant under *Octane Fitness. Id.* at 43-46.

9

has reviewed the record as to the Cook Claims in light of *Octane Fitness* and, again, concludes that fees are not warranted.

As explained in the court's prior order, Normark was ultimately successful in defending against the Cook Claims because of its success on its invalidity defense, which required proof by clear and convincing evidence. But for Normark's success on the invalidity defense, it would not have prevailed on the Cook Claims in light of its admission of literal infringement. Normark also failed to establish its counterclaim for inequitable conduct. Thus, although Normark was the prevailing party, it was not entirely successful, and much of its success was the result of success on an affirmative defense which required proof by clear and convincing evidence.

In its prior order, the court relied, in part, on the high standard of proof applicable to Normark's invalidity defense in analyzing the objective and subjective prongs under *Brooks*. *See* ECF No. 43-44 (addressing arguments relating to inventorship and on-sale bar defense). The court finds the same consideration significant under *Octane Fitness*. Given the high standard of proof applicable to Normark's invalidity defense and the particular arguments advanced by Pure Fishing (which, while ultimately unsuccessful, were not frivolous), the court does not find Pure Fishing's position to be so weak as to warrant an award of fees. Neither does the court find that Pure Fishing acted in an unreasonable manner in the way it litigated the Cook Claims, any improper motivation, or a need for compensation or deterrence. The court, therefore, declines to award fees as to the Cook Claims.

## V.    Other Fees

Normark's motion includes a request that this court award its fees incurred on appeal of the summary judgment order relating to the Cook Claims. The sum total of Normark's discussion of

10

this point appears in its last footnote and reads as follows: "Normark previously indicated that it would seek attorneys' fees incurred on appeal of the Cook Claims from the Federal Circuit. On reflection, however, Normark seeks these fees in the first instance from this Court, because this Court is much more familiar with the facts and history of this matter." ECF No. 391-1 at 23 n.8.

Given the brevity of this "argument" the court might conclude that this was merely an indication of intent to file some future motion in this court relating to fees incurred on appeal. However, because the amount sought for defense of the Cook Claims includes the fees on appeal, the court assumes Normark intends for the court to rule on this record. *See* ECF No. 391-1 at 24 (seeking $1,918,508.70 for defense of the Cook Claims). This is further supported by the Fourth Vitt Declaration which includes fees on appeal in this total and states: "Normark also seeks recovery of the fees and expenses incurred in connection with Pure Fishing's appeal of the Court's summary judgment decision. I attach as Exhibit A the invoices reflecting those fees and expenses, which total $97,158.01[.]" ECF No. 391-2 ¶ 6; *see also id.* ¶ 8 (including fees on appeal in total sought).

The court declines the invitation to address this aspect of Normark's motion for fees. While this court may be more familiar than the Court of Appeals with the history of this action in this court, it has no knowledge whatsoever of the arguments made on appeal, much less whether they were so weak that they should be considered "exceptional." Further, Normark has failed to provide this court with any basis on which to make this decision. In any event, the very logic of *Octane Fitness* suggests that such a motion should be directed to the court that considered the appeal.[6]

---

[6] Even if the motion for fees on appeal were properly before this court, it would find that Normark has, to this point, failed to present an adequate record to support the request for fees on appeal and, therefore, deny the motion to the extent it seeks appeal-related fees and expenses.

11

## CONCLUSION

For the reasons set forth above, the court grants Normark's renewed motion for fees in part, and awards an additional $283,127.09 in attorneys' fees and expenses for its defense of the Kelley Claim. The court denies the motion to the extent it seeks fees for defense of the Cook Claims and declines to consider the motion to the extent it seeks fees on appeal.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
October 28, 2014

Add. 58